721 A.2d 763

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Carolyn Ann KING, Appellant.**

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Bradley A. MARTIN, Appellant.**

Supreme Court of Pennsylvania.

Argued Feb. 2, 1998.

Decided Dec. 2, 1998.

334

340

342

M. Jennifer Weiss, Lebanon, Robert Brett Dunham, Philadelphia, for Carolyn Ann King, appellant.

Keith L. Kilgore, Lebanon, Robert Brett Dunham, Philadelphia, for Bradley Martin, appellant.

Bradford H. Charles, Donna Long Brightbill, Lebanon, Robert A. Graci, Office of Atty. Gen., for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

These are consolidated direct appeals from death sentences imposed after a jury found co-defendants, Carolyn King and Bradley Martin, guilty of first-degree murder and related offenses. We affirm.

On September 15, 1993, Martin, who was serving a sentence at the Lebanon County Correctional Facility as the result of a parole violation, obtained a two-hour visitation pass and left the prison. He met King, with whom he was romantically involved, and failed to return to prison as required. Instead, the two traveled to Palmyra, Pennsylvania, where they called upon Guy Goodman, with whom Martin was acquainted. Mr. Goodman, who was seventy-four years old, had written, telephoned and visited Martin in prison, identifying himself as Martin's friend.[1]

At some point, Martin and King had decided to obtain money from Mr. Goodman, and apparently they were prepared to use force. Soon after their arrival at Goodman's home, Martin hit Goodman over the head with a vase from the hallway, and the pair then bound Goodman's wrists, ankles and neck in such a manner that he could not extricate himself. They then wrapped a bathrobe around Goodman's head, placed a plastic bag over it, sealed the bag with duct tape, and wrapped a bedspread over the bag. Finally, they carried Goodman into the basement, tying him more securely and leaving him to suffocate.

Martin and King then stole Mr. Goodman's checkbook and credit card and drove away in his car. After several brief

---

1. Mr. Goodman's daughter later testified at trial that her father was attracted to young men, and an acquaintance of Martin's testified that she had seen Martin in Goodman's home on previous occasions, being openly affectionate with Goodman.

visits with friends in Pennsylvania, the couple fled across the country in Goodman's car, using his checks and credit card to pay their expenses. They were ultimately apprehended in Arizona, at which time King was advised of her rights and gave a statement to federal law enforcement officials, inculpating herself and Martin in Goodman's murder. King later reiterated her inculpatory statement to Lebanon County detectives who were investigating Goodman's death. While in custody in Arizona, Martin was interrogated by Lebanon County detectives, who gave him *Miranda* warnings. After signing a form stating that he waived his rights, Martin inculpated himself in the robbery and murder. Subsequently, Martin made an additional statement to a corrections officer at the Lebanon County Prison, admitting that he had killed Goodman.

Martin and King were charged with Goodman's murder and proceeded to a joint trial. Prior to trial, both defendants filed motions for severance, which the trial court denied. Additionally, Martin filed a motion to suppress his incriminating statement to the Lebanon County detectives, asserting that he had been under the influence of drugs at the time he gave the statement. The trial court denied the motion. Martin chose not to testify at the jury trial that followed, but King testified on her own behalf, and her tape-recorded inculpatory statement was played for the jury. At the conclusion of the guilt phase, the jury found both defendants guilty of first-degree murder, aggravated assault, robbery, theft by unlawful taking, flight to avoid apprehension, escape and conspiracy.

Trial proceeded to the penalty phase, during which the Commonwealth presented two aggravating circumstances with respect to both defendants: perpetration of the homicide during the commission of a felony, 42 Pa.C.S. §9711(d)(6), and commission of the offense by means of torture, 42 Pa.C.S. §9711(d)(8). In support of the aggravating circumstance at subsection (d)(6), the prosecutor reminded the jury that it had convicted both defendants of robbery, which is a felony, and that the killing had occurred during the commission of the robbery. In support of the aggravating circumstance at sub-

section (d)(8), the prosecutor introduced the videotaped testimony of Dr. Isadore Mihalikis, a forensic pathologist.

The Commonwealth also presented evidence in support of the aggravating circumstance of a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. §9711(d)(9), with respect to Martin. In support of this aggravating circumstance, the Commonwealth introduced evidence of Martin's five prior burglary and criminal trespass convictions.

Martin and King both presented evidence in support of the following mitigating circumstances: their ages at the time of the crime, 42 Pa.C.S. §9711(e)(4), and other evidence of mitigation concerning their character and records and the circumstances of the offense, 42 Pa.C.S. §9711(e)(8). King presented additional evidence in support of the mitigating circumstance that her participation in the homicidal act was relatively minor, 42 Pa.C.S. §9711(e)(7). Both Appellants sought to present evidence and argument concerning the character of a life sentence in Pennsylvania; however, the trial court sustained the Commonwealth's objection to such evidence and argument and declined to provide any instruction.

At the conclusion of the penalty phase, the jury found that all of the aggravating circumstances presented with respect to each defendant had been established, and found no mitigating circumstances for either defendant. Accordingly, death sentences were imposed. These consolidated appeals followed.

**SUFFICIENCY OF THE EVIDENCE**

■■■ Although Martin and King ("Appellants") do not challenge the sufficiency of the evidence, this Court is required to conduct an independent review of the sufficiency of the evidence supporting a first-degree murder conviction in all capital cases. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In conducting this review, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as the verdict winner and determine whether

the jury could have found every element of the crime to have been proven beyond a reasonable doubt. *Commonwealth v. Michael*, 544 Pa. 105, 110, 674 A.2d 1044, 1047 (1996).

■ To prove first-degree murder, the Commonwealth must demonstrate that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and that the killing was done in an intentional, deliberate and premeditated manner. 18 Pa.C.S. §2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). Circumstantial evidence can itself be sufficient to prove any element or all of the elements of criminal homicide. *Commonwealth v. Cox*, 546 Pa. 515, 528–29, 686 A.2d 1279, 1285 (1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997).

■ Here, the evidence adduced at trial established that the cause of Goodman's death was asphyxiation, which resulted from his head being encased in layers of wrappings while he was bound and unable to extricate himself. A neighbor who discovered the body testified that there were signs that a struggle had occurred in the victim's home. Further examination of the home by the police revealed that the upstairs had been ransacked, and Martin's fingerprints were found on currency that had been left in the victim's bedroom. Both King's and Martin's fingerprints were found on pieces of duct and masking tape that were left in the home, as well as on a glass and a bowl of peanuts in the kitchen. Handwriting on checks that were drawn on the victim's bank account matched that of King, and a number of store clerks identified King and Martin as the individuals who had presented the victim's credit card or checks to them as payment. When King and Martin were apprehended, Martin was in possession of Mr. Goodman's credit card, and blank checks found in Goodman's abandoned vehicle bore the fingerprints of both defendants. Additionally, King confessed to both federal agents and Lebanon County detectives, implicating herself and Martin in the murder. Martin also confessed to Lebanon County detectives, as well as to a Lebanon County corrections officer, admitting

that he had hit Goodman over the head with a vase and that he had tied up Goodman "real good."

Thus, the evidence in this case is clearly sufficient to support the convictions of first-degree murder, and we now turn to the issues raised by Martin and King in their appeals.

## GUILT PHASE

Appellants' first argument arising from the guilt phase of trial is their claim that the trial court erred in denying their motions for severance. Appellants emphasize that their defenses were mutually antagonistic, in that they each contended that the other manipulated him or her into participating in the crimes. Thus, Appellants argue, the consolidation of their trials was prejudicial, because the jury's acceptance of one defendant's defense would necessarily have required it to reject the other's defense and convict that defendant.

Pennsylvania Rule of Criminal Procedure 1127 provides that defendants charged in separate indictments may be tried together if they are alleged to have participated in the same acts constituting the offenses charged. Pa.R.Crim.P. 1127(A)(2). However, Rule 1128 provides that separate trials may be ordered if it appears that any party may be prejudiced by a joint trial. Pa.R.Crim.P. 1128. The decision whether to sever the trials of co-defendants resides within the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of such discretion. *Commonwealth v. Morales,* 508 Pa. 51, 61, 494 A.2d 367, 372 (1985).

In this case, both defendants attempted to exculpate themselves by inculpating the other defendant. Such finger pointing alone, however, is insufficient to warrant separate trials. *See Commonwealth v. Lambert,* 529 Pa. 320, 332, 603 A.2d 568, 573 (1992). Furthermore, this Court has stated that "[t]he mere fact that there is hostility between defendants, or that one may try to save himself at the expense of another, is in itself not sufficient grounds to require separate trials. In fact, it has been asserted that the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a

joint trial because the truth may be more easily determined if all are tried together." *Commonwealth v. Chester*, 526 Pa. 578, 590, 587 A.2d 1367, 1373, *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991) (citations omitted). Additionally, where the defendants have been charged with conspiracy, a joint trial, rather than separate trials, is preferred. *See id.* at 589–90, 587 A.2d at 1372–73.

Here, the following factors militated in favor of a joint trial: Appellants were charged with conspiracy; the majority of the crimes charged were the same; the circumstances giving rise to the crimes were identical with respect to both defendants; and the witnesses necessary to prove the crimes were the same. The fact that Appellants argued conflicting versions concerning the extent of their participation in the crimes is not controlling, and we perceive no abuse of discretion by the trial court in refusing to sever.

Appellants also contend that the indictment charging Martin with escape should not have been consolidated with the indictment charging him with homicide.[2] Martin argues that placement of the escape charge before the jury inappropriately disclosed the fact that he had been imprisoned for a previous offense and had violated the terms of visitation-release. Therefore, he claims that the jury was presented with evidence of prior offenses, which was inadmissible with respect to the homicide charge. King argues that the evidence of prior offenses implicit in Martin's escape indictment was prejudicial to her, because it portrayed her as being guilty

---

2. Like a number of Appellants' claims of trial error, this issue was not properly preserved for review. King concedes that her counsel consented to the consolidation of offenses, and Martin's counsel neither objected nor consented on the record. Moreover, apparently as a consequence of the continued involvement of trial counsel in these appeals, neither of the Appellants has framed his or her challenge to the propriety of consolidation in terms of counsel's ineffectiveness, which would ordinarily be required to preserve the opportunity for review. *See Commonwealth v. Griffin*, 537 Pa. 447, 454, 644 A.2d 1167, 1170 (1994). However, the relaxed waiver standard employed in capital cases on direct review permits consideration of this issue on its merits. *See Commonwealth v. Gibson*, 547 Pa. 71, 91 n. 19, 688 A.2d 1152, 1162 n. 19, *cert. denied*, —— U.S. ——, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997); *Zettlemoyer*, 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19.

by association with an individual who was predisposed to criminal behavior.

■ Like the decision to sever, the determination of whether to consolidate separate indictments for trial is a matter addressed to the sound discretion of the trial court, and the trial court's ruling will not be disturbed absent a manifest abuse of such discretion or prejudice and clear injustice to the defendant. *Commonwealth v. Morris*, 493 Pa. 164, 171, 425 A.2d 715, 718 (1981). Pennsylvania Rule of Criminal Procedure 1127 provides that offenses charged in separate indictments may be consolidated for trial if: 1) the evidence of each offense would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or 2) the offenses charged are based on the same act or transaction. Pa. R.Crim.P. 1127(A)(1)(a), (b).

■ Although evidence of prior crimes is inadmissible for the sole purpose of demonstrating a defendant's bad character or propensity for criminal behavior, *Commonwealth v. Banks*, 513 Pa. 318, 349, 521 A.2d 1, 17, *cert. denied*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987), such evidence may be admitted under special circumstances where it is relevant for some other, legitimate purpose. *Commonwealth v. Claypool*, 508 Pa. 198, 204, 495 A.2d 176, 178 (1985). One special circumstance is present where the prior crimes evidence is part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. *Commonwealth v. Lark*, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988) (citations omitted).

■ Here, Martin's escape was clearly part of the natural chain of events leading up to Mr. Goodman's murder, and the charges of escape and homicide therefore stemmed from essentially a single criminal episode. Moreover, having reviewed the record, we conclude that the evidence in support of each offense was capable of separation by the jury. The trial court specifically instructed the jury that it was required to decide separately each issue before it: "Simply because I

decided to consolidate these cases does not allow you to consider them as one for purposes of your deliberations." Thus, we discern no abuse of discretion by the trial court or prejudice to either appellant as a result of the consolidation of the indictments.[3]

Appellants also contend that evidence of their possession of marijuana and of Martin's prior violations of his work-release privileges constituted evidence of uncharged prior offenses, which should not have been admitted at trial. Contrary to Appellants' contentions, the evidence of Martin's previous visits with Mr. Goodman while on a work-release pass was presented for the legitimate purpose of establishing that there was a relationship between the two men prior to Goodman's murder. With respect to certain witnesses' references to Appellants' possession of marijuana, the majority of these comments were inadvertently elicited when the prosecutor asked one of the witnesses to describe his conversations with Appellants after the murder. The other references were elicited on cross-examination by defense counsel either in an attempt to discredit another witness, or merely as part of the sequence of events immediately following the murder. At no time did either appellant object to the testimony, nor did the Commonwealth seize upon the references to Appellants' possession of drugs, which occurred infrequently and were innocuous in the context of the overall trial. Accordingly, no relief is due either appellant on this claim.

Appellants next challenge the admission of a photograph of the victim's body and evidence concerning the personal character of the victim. It is well settled that a decision concerning the admission or exclusion of evidence is within the sound discretion of the trial court and will not be disturbed

---

3. Martin further claims that consolidation of the two indictments improperly injected his prior offenses, which do not fall within any of the enumerated statutory aggravating factors, into the penalty phase of the proceedings. Given the trial court's specific instructions defining the appropriate considerations for the jury in sentencing, *see infra,* and Martin's failure to demonstrate any specific prejudice as a result of the consolidation, he is entitled to no relief on such claim.

absent an abuse of such discretion. *Commonwealth v. Cohen,* 529 Pa. 552, 563, 605 A.2d 1212, 1218 (1992).

The challenged photograph was among several that the Commonwealth offered into evidence at trial as probative of the manner in which the homicide occurred. The trial court overruled defense counsels' objection to the admission of these photographs, ruling that they were not inflammatory. Appellants now argue that Exhibit 42, a black-and-white photograph depicting the manner in which the victim was tied, was indeed inflammatory because it also depicted certain signs of the body's decomposition, specifically, the blackening of the victim's hands and the secretion of bodily fluids. Appellants also point to the fact that other photographs that were admitted rendered substantially the same image, without the graphic depiction of decomposition. Therefore, Appellants claim that Exhibit 42 not only was inflammatory, but also was cumulative evidence that need not have been admitted.

Photographs of a murder victim are not *per se* inadmissible. *See Chester,* 526 Pa. at 591, 587 A.2d at 1373 (citations omitted). "To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in the exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt." *Commonwealth v. McCutchen,* 499 Pa. 597, 602, 454 A.2d 547, 549 (1982). The determinative inquiry is whether the evidentiary value of the photographs outweighs the possibility of inflaming the minds and passions of the jurors. *See Commonwealth v. Jacobs,* 536 Pa. 402, 406–07, 639 A.2d 786, 788 (1994).

Here, the challenged photograph, although clearly showing the initial stages of decomposition, was relevant in that it depicted the manner in which the victim was tied, which was essential to proving the intent element of first-degree

murder. As the trial court noted in ruling on Appellants' objection, the jury was informed by the district attorney that the bodily fluids and blackening of the victim's hands were attributable to the decomposition process. Accordingly, we perceive no abuse of discretion by the trial court in admitting Exhibit 42 into evidence. *See generally Commonwealth v. Hudson*, 489 Pa. 620, 631, 414 A.2d 1381, 1386–87 (1980)(finding that the trial court did not abuse its discretion in admitting photographic evidence depicting the manner in which a homicide victim was bound, which evidence "aided the jury by showing the area in which the crimes were committed and the position of the corpse in that area").

██ Appellants further contend that certain evidence touching upon the personal character of the victim was inflammatory and should not have been admitted. The Commonwealth introduced, through the testimony of Detective Richard Radwanski, a letter that Mr. Goodman had written to Martin. In the letter, Goodman mentioned his regular attendance of church services, his health problems, and his concern for his own mortality. He also expressed confidence, support and concern for Martin. Testimony was heard from the victim's daughter, who responded affirmatively to the prosecutor's question regarding whether she had been concerned for her father because he lived alone and would be unable to seek assistance if he was ever injured. Additionally, a photographer from a local newspaper testified that he had photographed the victim's home for an article on distinctive homes, and several of these photographs were admitted into evidence. Appellants claim that all of this evidence not only was irrelevant, but also was prejudicial because it was calculated to generate sympathy for the victim and his family during both the guilt and penalty phases of trial.

Contrary to Appellants' assertion, all of the challenged evidence was relevant to issues that were before the jury. *See generally Commonwealth v. LaCava*, 542 Pa. 160, 174, 666 A.2d 221, 227 (1995)(stating that "[e]vidence is considered relevant if it logically tends to establish a material fact in the case, tends to make the fact at issue more or less probable, or

supports a reasonable inference or presumption regarding the existence of a material fact"). Given that there were no signs of forced entry into Mr. Goodman's home, the inference arose that the murder had been committed by someone who was acquainted with him and either had his own key or had been voluntarily admitted. Thus, the letter was properly admitted to establish that Martin had a prior relationship with Goodman. The testimony of the daughter was probative of the fact that Goodman resided alone. Finally, the photographs and accompanying testimony of the photographer were relevant because the pictures depicted the vase that Martin used to strike Goodman, as well as a hutch from which, according to the testimony of Goodman's daughter, the defendants could have obtained the duct tape that they used to bind Goodman. Moreover, the trial court did not abuse its discretion in determining that the potential prejudice about which Appellants complain, namely the effect of sympathetic glimpses of Goodman's character and life which the jury could have gleaned from the evidence, was outweighed by the probative value of these proofs.

Next, Martin contends that he is entitled to a new trial because his incriminating statements that were admitted at trial had been obtained after he had invoked his Fifth Amendment right to counsel and, for that reason, should have been suppressed.

Martin claims that at the time of his arrest in Arizona, he was approached by federal agents and was given *Miranda* warnings. He asserts that at that time, he indicated that he did not wish to speak to anyone until he had spoken with an attorney, and the interview was terminated. However, he alleges that later that same day, he agreed to speak with an agent about the offenses, and after again being provided with additional *Miranda* warnings, he admitted to possessing the victim's credit card and stated that he had obtained it three weeks previously in Palmyra, Pennsylvania. Martin now points to this alleged statement, as well as the statements that he made to the county detectives and the corrections officer, in arguing that his constitutional rights were violated.

■ It is true that where a defendant specifically invokes his Fifth Amendment right to have counsel present during interrogation by law enforcement officials, the government may not initiate subsequent interrogation without counsel's presence, even if the accused agrees to waive his rights.[4] *See Commonwealth v. Santiago*, 528 Pa. 516, 522, 599 A.2d 200, 202–03 (1991). The defendant, however, is required to establish that he did indeed invoke his Fifth Amendment right to counsel. *Commonwealth v. Marinelli*, 547 Pa. 294, 319–20, 690 A.2d 203, 216 (1997) (finding no error in the suppression court's rejection of an appellant's claim that his Fifth Amendment right to counsel was violated, where nothing credible in the record suggested that the appellant had invoked such right), *cert. denied,* —— U.S. ——, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998).

■ In this case, the transcript from the suppression hearing and the trial record do not contain any evidence that Martin invoked his right to counsel and privilege against self-incrimination; nor is there support in the record for Martin's account of the circumstances under which he gave an incriminating statement to the federal agent. Accordingly, Martin has failed to establish a violation of his Fifth Amendment rights. *See generally Marinelli*, 547 Pa. at 320, 690 A.2d at 216.

■ Moreover, with respect to the statement given to the detectives, which is the only statement that Martin challenged in his suppression motion, Martin was fully advised of his rights. The record from the suppression hearing indicates that he was given *Miranda* warnings and was provided with a

4. In addition to the Sixth Amendment right to counsel, the United States Supreme Court has held that a separate right to counsel is encompassed in the Fifth Amendment guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." *See McNeil v. Wisconsin*, 501 U.S. 171, 177–78, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991). The United States Supreme Court described the Fifth Amendment right to counsel as one of several "prophylactic rights designed to counteract the 'inherently compelling pressures' of custodial interrogation." *Id.* at 176–77, 111 S.Ct. at 2208 (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

waiver form. After reading the form and certifying that he understood his rights and wished to waive them, Martin signed the form and gave his incriminating statement to the detectives. We perceive nothing improper concerning the circumstances under which this statement was given. Accordingly, the trial court did not abuse its discretion in denying Martin's motion to suppress and in admitting the statement at trial.

With respect to the statement given to the corrections officer concerning the killing, the record indicates that it was Martin who initiated the conversation. It is well settled that a gratuitous utterance, unsolicited by the government, is admissible, and that *Miranda* warnings are unnecessary under such circumstances. *Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 533, 678 A.2d 342, 351 (1996), *cert. denied*, 520 U.S. 1157, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997). Therefore, this statement was validly obtained and was admissible.

King individually claims that the trial court abused its discretion by admitting a variety of irrelevant, inadmissible and prejudicial evidence against her at trial. Specifically, King asserts that both the Commonwealth and the trial court improperly vouched for the credibility of prosecution witness Barbara Charles by stating that she was the wife of the district attorney. King further asserts that the admission of an application that she filed for federal assistance, as well as testimony concerning the fact that she checked into a local motel as "Anna" King on September 15, 1993 with another party, stigmatized her as a promiscuous person who lived off public assistance. King also contends that the Commonwealth's cross-examination of her improperly focused on matters that were irrelevant and collateral, and that the testimony of certain witnesses who were called by the Commonwealth to rebut her own testimony, in particular concerning her marriage to Carl William King, was collateral and prejudicial.

All of King's claims concerning these evidentiary issues are meritless. The testimony of Barbara Charles was presented to authenticate King's signature on the application

for federal assistance, which was included in a list of King's handwriting exemplars that were compared to the signatures on the checks drawn on Goodman's account. Mrs. Charles was the caseworker who had accepted King's application. At no time during Mrs. Charles' testimony did she attempt to cast King in a negative light because of the fact that she had applied for assistance; rather, Mrs. Charles simply related the information contained within the application and verified that King was the person who had signed it. Furthermore, the comments made by the trial court and the prosecutor concerning the fact that Mrs. Charles happened to be the district attorney's wife were merely passing references that were not seized upon by the Commonwealth in order to bolster her veracity.

With respect to the testimony concerning King's use of the alias "Anna King" when she checked into a motel, this evidence was relevant in light of the facts that King had used her real name when she went to meet Martin at the prison, and that the motel was within close proximity to the prison. Thus, King's use of an alias was probative of her knowledge that Martin would be improperly absent from prison and of her desire to facilitate his escape.

Finally, the testimony of King elicited by the Commonwealth on cross-examination, as well as the testimony of the witnesses called to rebut King, was not improper. During King's direct examination, defense counsel played King's tape-recorded statement to the Lebanon County detectives, as a predicate to King's defense of duress. In that statement, King had asserted that she was married to Martin and that he was the father of her son. Therefore, it was proper for the Commonwealth to impeach King's credibility on cross-examination by questioning her concerning the fact that she was legally married to Carl William King, who was listed on her son's birth certificate as the child's father. Several of the Commonwealth's rebuttal witnesses also testified to this fact. Additionally, King challenges the testimony of a prison guard concerning King's reputation as an outspoken leader

and King's alleged comments concerning the sentence she would receive if Martin pled guilty. Such testimony was a relevant and appropriate rebuttal of King's defense, in which she had portrayed herself as a passive companion who had been coerced into participating in the robbery and murder.

Because the evidence complained of was relevant and the trial court appropriately exercised its discretion in determining that its probative value outweighed any prejudicial effect, King is due no relief.

## PENALTY PHASE

In their first argument concerning the penalty phase of trial, Appellants contend that they were denied an impartial sentencing jury, because the trial court failed to issue an instruction advising jurors that they were permitted to consider feelings of sympathy and mercy for Appellants in connection with the return of sentences. Appellants essentially acknowledge that such an instruction is not generally required under Pennsylvania jurisprudence;[5] however, they argue that the instruction was necessary in this case to cure misleading inferences that the jury could draw from "anti-sympathy" references made during voir dire.[6] Appellants contend that

**5.** This Court has held that absolute "mercy verdicts" are prohibited. *See Commonwealth v. Henry,* 524 Pa. 135, 159–60, 569 A.2d 929, 941 (1990), *cert. denied,* 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991). Further, in *Commonwealth v. Hill,* 542 Pa. 291, 666 A.2d 642 (1995), *cert. denied,* 517 U.S. 1235, 116 S.Ct. 1880, 135 L.Ed.2d 175 (1996), the Court rejected the argument that a sentencing jury must be instructed that it can dispense mercy if it so chooses, noting that the "[a]ppellant was allowed to present and argue any evidence which was relevant and admissible in an attempt to convince the jury that the death sentence should not be imposed in this case. That is all that is constitutionally required." *Id.* at 311, 666 A.2d at 652 (quoting *Commonwealth v. Young,* 536 Pa. 57, 76, 637 A.2d 1313, 1322 (1993)).

**6.** For example, prospective jurors were presented with a questionnaire that included the following question: "Would you have any problems putting aside any sympathy you might feel for anyone involved in the trial and deciding the case on the evidence alone?" All of the prospective jurors responded in the negative, and eleven of the jurors who were empanelled specifically indicated during individual voir dire that they would not give effect to feelings of sympathy in reaching their verdict, including feelings of sympathy arising from Appellants' family situations. Appellants also complain about similar questions asked by the district attorney during individual voir dire.

the jurors' affirmative responses to voir dire inquiries probing their ability to eschew sympathy and render a decision based upon the evidence support the inference that the jury was incapable of considering and giving full effect to the mitigating evidence and making an appropriate penalty determination. Based upon such an inference, Appellants ask that we find that the sentences of death are infirm under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as under Article I, Sections 9 and 13 of the Pennsylvania Constitution.

Appellants cite *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), in support of their federal constitutional claims. *Lockett* and *Eddings,* however, stand only for the proposition that a state may not bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial. *See Saffle v. Parks,* 494 U.S. 484, 490, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990). *Morgan* stands for the proposition that any juror to whom mitigating factors are irrelevant should be disqualified for cause, as such juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial. *See Morgan,* 504 U.S. at 738–39, 112 S.Ct. at 2235.

The United States Supreme Court, however, has made clear that general anti-sympathy instructions implicate neither of these concerns and, further, such instructions in general are not prohibited by the federal Constitution. *See Saffle,* 494 U.S. at 486, 110 S.Ct. at 1259 (stating that a constitutional rule prohibiting anti-sympathy instructions "is not dictated by our prior cases and, were it to be adopted, it would contravene well-considered precedents"). In *Saffle,* an Oklahoma trial court included among its jury instructions in the penalty phase of a capital case an admonition that the jury was to avoid the influence of sympathy.[7] The appellant contended that the

7. The relevant instruction was as follows:

anti-sympathy instruction ran afoul of *Lockett* and *Eddings*, because jurors who might otherwise have reacted sympathetically to mitigating evidence might have interpreted the instruction as barring them from considering that evidence altogether. In rejecting this argument, the Court distinguished the factors the jury must be permitted to consider from how the jury may be guided in considering and weighing those factors in deciding the sentence:

Th[e appellant's] argument misapprehends the distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required, for the State to insist that "the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary. At the very least, nothing in *Lockett* and *Eddings* prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a "reasoned *moral* response," rather than an emotional one. The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice.

You are the judges of the facts. The importance and worth of the evidence is for you to determine. You must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence. You should discharge your duties as jurors impartially, conscientiously, and faithfully under your oaths and return such verdict as the evidence warrants when measured by these Instructions.

*Saffle*, 494 U.S. at 487, 110 S.Ct. at 1259.

*Saffle,* 494 U.S. at 493, 110 S.Ct. at 1262–63 (citations omitted; emphasis in original).

Our own precedent has developed along similar lines. In *Commonwealth v. Lesko,* 509 Pa. 67, 501 A.2d 200 (1985), *cert. denied,* 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987), this Court addressed a claim that the trial court erred in its instruction to the sentencing jury to disregard sympathy in reaching its sentencing decision. The Court concluded that where the trial court had properly instructed the jury concerning the broad mitigation provision at Section 9711(e)(8), 42 Pa.C.S. §9711(e)(8), it had satisfied all pertinent constitutional requirements. *Id.* at 80–81, 501 A.2d at 207; *see also Commonwealth v. Rainey,* 540 Pa. 220, 234–35, 656 A.2d 1326, 1334 (holding that where trial court instructed jury on "catchall" provision of Section 9711(e)(8) and informed jury that its verdict was to be reached by weighing aggravating and mitigating circumstances against each other, such instruction was correct and nothing further was required), *cert. denied,* 516 U.S. 1008, 116 S.Ct. 562, 133 L.Ed.2d 488 (1995).

 In light of *Saffle* and *Lesko,* Appellants' claims of constitutional infirmity in their sentences fail. Preliminarily, the complained-of statements in this case were in the form of questions asked during voir dire and thus of less direct relevance to the jury's ultimate sentencing decision than were the trial courts' penalty instructions upheld in *Saffle* and *Lesko.* Further, such questions did not suggest that the jurors eschew sympathy specifically for Appellants, but rather, asked whether they would be able to put sympathy aside altogether to decide the case based upon the evidence presented.[8] Most important, at the outset and at the close of the penalty phase, the trial court clearly instructed the jurors that they were required to consider "any other evidence of mitigation concerning the character and record of the defendant[s] and the circumstances of [their] offense." The trial court also

8. As noted by the United States Supreme Court, a jury's reliance upon extraneous emotional factors "would be far more likely to turn the jury against a capital defendant than for him." *California v. Brown,* 479 U.S. 538, 543, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987).

instructed the jury concerning the parties' respective burdens of proof and the proper weighing of the aggravating circumstances against the mitigating circumstances. Thus, read as a whole, the trial court's jury instruction fully and fairly apprised the jury of its duties concerning mitigating evidence. The questions asked during voir dire did no more than probe whether the jurors could confine themselves to the facts and the law and not be distracted by matters unrelated to the evidence; such questions in no way misled the jury into ignoring properly admitted evidence that might have been favorable to Appellants. Thus, under both federal and state precedents, the voir dire was proper, and no relief is due Appellants on this issue.

Appellants further contend that the trial court improperly permitted the jury to be "death-qualified" by permitting voir dire to exclude those jurors who were opposed to the death penalty, while at the same time it failed to require the jury to be "life-qualified" by conducting an examination to determine whether any jurors were partial to the death penalty. Appellants claim that the resulting jury was, therefore, disproportionately "pro-death."

 This Court has repeatedly held that the process of screening prospective jurors to determine whether any has moral, religious or ethical beliefs that would prevent him or her from voting for the death penalty is consistent with the guarantees of a fair trial. *See, e.g., Marinelli*, 547 Pa. at 320, 690 A.2d at 216 (citing *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)); *Lambert*, 529 Pa. at 335–36, 603 A.2d at 575. Conversely, pursuant to the due process clause of the Fourteenth Amendment to the United States Constitution, a defendant in a capital case is permitted to pose questions during voir dire in order to determine if any juror is incapable of returning a verdict of life imprisonment. *See Commonwealth v. Blount*, 538 Pa. 156, 163, 647 A.2d 199, 203 (1994) (citing *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). While permitted, however, life qualification questions are not required, and the absence of such questions alone does not implicate error on the part of the

trial court. *See Commonwealth v. Hardcastle,* 549 Pa. 450, 455–56, 701 A.2d 541, 543 (1997). The scope of voir dire remains a matter committed to the sound discretion of the trial court, subject to review only for abuse of discretion. *See Commonwealth v. Fisher,* 545 Pa. 233, 249, 681 A.2d 130, 137 (1996).

In this case, Appellants' trial attorneys were permitted to ask general questions of prospective jurors, and the record does not reflect the imposition of any restrictions that would have precluded exploration of whether any of the jurors had fixed views about the imposition of a life sentence. All jurors completed a questionnaire that developed aspects of their individual beliefs about the death penalty and inquired whether they would be able to follow the judge's instructions regarding the applicable law. In the absence of any specific complaint or showing of unwarranted preclusion by the trial court, Appellants' claim fails.

Appellants next challenge certain portions of the trial court's jury instructions concerning the imposition of a life sentence, and the nature and use of aggravating and mitigating circumstances.

A trial court has broad discretion in phrasing its instructions to the jury and can choose its own wording so long as the law is clearly, adequately and accurately presented to the jury for consideration. *Commonwealth v. Hawkins,* 549 Pa. 352, 391, 701 A.2d 492, 511 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998). Furthermore, a trial court need not accept counsel's wording for an instruction, as long as the instruction given correctly reflects the law. *Commonwealth v. Ohle,* 503 Pa. 566, 582, 470 A.2d 61, 70 (1983). In reviewing a challenged jury instruction, an appellate court must consider the entire charge as a whole, not merely isolated fragments, to ascertain whether the instruction fairly conveys the legal principles at issue. *Commonwealth v. Jones,* 546 Pa. 161, 192, 683 A.2d 1181, 1196 (1996).

Appellants challenge the trial court's refusal to instruct the jury that a defendant in a capital case who is

sentenced to life imprisonment is ineligible for parole. They claim that the evidence concerning Martin's history of felony convictions, his violation of his parole and work-release privileges, as well as the fact that King was out of prison despite approximately twenty prior convictions, implicitly raised the issue of future dangerousness, thereby requiring an instruction that a life sentence in a capital case means "life without parole."

In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the United States Supreme Court held that where future dangerousness is at issue and a specific request is made by a capital defendant, due process mandates that the jury be informed what the term "life sentence" means. *See also Commonwealth v. Speight*, 544 Pa. 451, 469, 677 A.2d 317, 326 (1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997); *Commonwealth v. Simmons*, 541 Pa. 211, 250 n. 15, 662 A.2d 621, 640 n. 15 (1995), *cert. denied*, 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996); *Commonwealth v. Christy*, 540 Pa. 192, 216, 656 A.2d 877, 889, *cert. denied*, 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995). Conversely, instructions detailing the character of a life sentence are not required where future dangerousness is not expressly implicated. *See Commonwealth v. May*, 551 Pa. 286, 290–92, 710 A.2d 44, 47 (1998). The trial court is not required to issue the instruction based upon references to a defendant's past violent acts alone. *Id.*

Here, contrary to Appellants' assertion, the issue of future dangerousness was not before the jury. At no time during either phase of trial did the prosecutor argue or suggest that the death penalty should be imposed because Appellants could potentially hurt someone else in the manner in which they had harmed Mr. Goodman. Nor did the prosecutor suggest that if a sentence of life imprisonment were imposed, Appellants eventually could be released on parole. The introduction of evidence concerning Martin's escape from prison and parole violations during the guilt phase of trial, and of Martin's prior felony convictions during the penalty phase, was not the equivalent of raising the issue of future dangerousness. *See*

*May*, 551 Pa. at 290–92, 710 A.2d at 47. Accordingly, the trial court properly denied defense counsel's request for an instruction on life imprisonment.[9]

■ Appellants also argue that the trial court improperly instructed the jury concerning the nature and use of aggravating and mitigating circumstances. During its opening instructions to the jury, the trial court stated: "Loosely speaking, aggravating circumstances are those things about this particular killing and the killer which make a first degree murder case more terrible and deserving of the death penalty, while mitigating circumstances are those things which make the case less terrible and less deserving of death." In its closing instructions, the court reiterated, "Aggravating and mitigating circumstances ... are things that make a first degree murder case either more terrible or less terrible." Appellants claim that such instructions improperly diverted the jury's focus to the "terribleness" of the circumstances of the case, rather than to Appellants' personal culpability.

This argument is meritless. Our review of the record reveals that the instruction given by the trial court was nearly identical to that set forth in Sections 15.2502E and F of the Pennsylvania Suggested Standard Criminal Jury Instructions.[10] Indeed, the word "terrible," of which Appellants complain, is specifically used in the standard instructions concerning aggravating and mitigating circumstances. More-

9. Appellants also argue that the trial court's refusal to instruct the jury concerning the meaning of life imprisonment prevented the jury from considering and giving full effect to relevant mitigating evidence, presented the jury with a false choice of sentencing options, denied Appellants the heightened procedural safeguards required in capital cases, produced an arbitrary and capricious sentence, and violated the Eighth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 9 and 13 of the Pennsylvania Constitution. In light of our previous decisions in this area, cited above, all of these arguments are rejected.

10. While the Court does not adopt or approve these standard instructions in the first instance, we have lent our approval to certain specific instructions on a case-by-case basis and have often considered the trial court's reliance upon the standard language as an aid in our review. *See generally Commonwealth v. Tilley*, 528 Pa. 125, 141, 595 A.2d 575, 583 (1991).

over, in addition to the general description cited by Appellants, the trial court specifically explained to the jury each mitigating circumstance claimed by each of Appellants. *See Commonwealth v. Saranchak*, 544 Pa. 158, 175–76, 675 A.2d 268 (Pa.1996)(rejecting challenge to a penalty-phase instruction describing aggravating and mitigating circumstances as "things that make a first degree murder case more or less terrible" on the basis that the trial court's entire instruction appropriately explained the mitigating circumstances at issue), *cert. denied,* —— U.S. ——, 117 S.Ct. 695, 136 L.Ed.2d 617 (1997). The trial court also instructed the jury concerning the relative burden of proof with respect to both types of circumstances and explained the meaning of the standards of reasonable doubt and preponderance of the evidence. Thus, the trial court adequately and accurately apprised the jury of its function in the penalty phase of the proceedings.

Next, Appellants raise multiple issues connected with the jury's determination that the killing of Mr. Goodman implicated the aggravating circumstance of torture, 42 Pa.C.S. §9711(d)(8). First, Appellants contend that the evidence was insufficient to support the jury's finding of torture.

 Although Section 9711(d)(8) is silent concerning specific intent to torture, this Court has interpreted the statute as requiring the existence of a specific intent to inflict pain and suffering, separate and apart from the specific intent to kill. *Commonwealth v. Auker*, 545 Pa. 521, 551, 681 A.2d 1305, 1321 (1996). In elaborating on the requirement of a separate specific intent to torture, this Court has stated that "[t]here must be an indication that the killer was not satisfied with the killing alone." *Id.* Furthermore, "[i]mplicit in the definition of torture is the concept that the pain and the suffering imposed upon the victim was unnecessary, or more than needed to effectuate the demise of the victim." *Chester*, 526 Pa. at 607, 587 A.2d at 1381. Thus, although in many homicide cases the victim suffers considerable pain and anguish, the aggravating circumstance of torture is not established unless the Commonwealth shows beyond a reasonable doubt that the defendant "intended to inflict pain beyond that

which accompanied the intentional killing. . . ." *Auker,* 545 Pa. at 551, 681 A.2d at 1321.

In this case, Mr. Goodman was injured, bound and killed in a cruel and progressive manner. Martin hit him over the head, then taped his mouth, after which Appellants wrapped various materials around his head, bound him in a manner such that his breathing was further constricted as he struggled, and dragged him to the basement where he died a lingering death. While Appellants would have had the jury infer from the circumstances of the killing that Goodman's suffering was merely an unintended collateral consequence of their clumsy improvisation, in addressing arguments as to the sufficiency of the evidence, we must view the evidence in the light most favorable to the Commonwealth as the verdict winner and draw all reasonable and proper inferences in Commonwealth's favor. *See Hardcastle,* 519 Pa. at 246, 546 A.2d at 1105. Here, Appellants chose a particularly heinous manner in which to terrorize and murder Goodman, and the circumstances of the killing provided sufficient evidence from which the jurors could infer an intent on their part to torture.

Appellants also challenge certain evidence that was admitted in support of the aggravating circumstance of torture. Specifically, they contend that the trial court erred in permitting the jury to view the videotape of Dr. Mihalikis' testimony concerning Mr. Goodman's emotional state at the time of the homicide, and that certain statements made by the pathologist were inflammatory and prejudicial.

In questioning Dr. Mihalikis during the penalty phase, the Commonwealth focused extensively upon Goodman's mental state. For example, the Commonwealth explored the psychological effect of the victim's hands being tied behind his back, eliciting from Dr. Mihalikis a statement that Goodman would have experienced terror because of the physical limitations and the resulting impossibility of freeing himself. On further questioning, Dr. Mihalikis went on to describe the physical sensations that Goodman would have experienced during suffocation, noting that there would have been a period of terror

when he realized his impending death. In response to further questions concerning what Goodman experienced while he suffocated, Dr. Mihalikis reiterated that the altercation, the binding and the wrappings were all "very, in fact extremely, terrorizing," and that Goodman experienced not so much actual pain, but terror because he was not getting enough oxygen and would eventually run out of air and die. The doctor stated, "That's the kind of terror. He knows that if he doesn't get free, he's going to die." Finally, he concluded, "I have no doubt that fear is probably a mild term ... to have gone through this kind of a confrontation, to have all these things on top of you, to have the binding ... it is not fear, it is terror with a capital T."

Near the conclusion of this testimony, the trial judge noted that he "was not clear whether we need this doctor's testimony to tell us that someone who knows of impending death undergoes periods of fear and terror." However, the videotape of the doctor's testimony was admitted into evidence during the penalty phase, over defense counsels' objection.

 "Expert testimony is permitted as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman." *Auker*, 545 Pa. at 543, 681 A.2d at 1317 (citing *Commonwealth v. O'Searo*, 466 Pa. 224, 229, 352 A.2d 30, 32 (1976)). Where the issue involves a matter of common knowledge, expert testimony is inadmissible. *O'Searo*, 466 Pa. at 229, 352 A.2d at 32. Here, there certainly was no need for an expert to testify to the fear that Mr. Goodman felt in his confrontation with Martin and King—the fact that a human being would experience fear and terror as he is brutalized and suffocated is so basic that expert opinion is unnecessary to assist the jury. Therefore, this is not a subject upon which expert testimony is admissible.

The Commonwealth asserts, however, in the alternative, that Dr. Mihalikis' testimony was admissible as lay opinion testimony. We reject this argument. Dr. Mihalikis was presented by the Commonwealth as an expert witness. The

Commonwealth obviously intended for the jury to view his testimony as being cloaked with the knowledge and skill possessed by persons in his areas of expertise. The testimony was not presented in a manner such that Dr. Mihalikis could step out of his role as expert, depending upon the intended focus of the Commonwealth's proof, nor was the jury so instructed. Accordingly, the testimony concerning the victim's emotional state was improperly admitted.

Finally, the Commonwealth asserts that, if the admission of Dr. Mihalikis' testimony was error, such error was harmless for the very reason that the testimony was not properly admitted, namely, that the pathologist's commentary merely reflected the jury's existing, common understanding concerning Mr. Goodman's mental state at the time of the killing. However, improper expert testimony may place undue emphasis upon common inferences and explanations. *See Collins v. Zediker*, 421 Pa. 52, 55, 218 A.2d 776, 778 (1966)(stating that "[j]urors are humans and are impressed by scientific talk even though, upon profound reflection, they could realize that in the particular field under discussion they are as much at home as the scientist"). Here, particularly given the extensive focus of the district attorney upon Dr. Mihalikis' assessment concerning Goodman's mental state, we cannot conclude that the trial court's error in permitting the testimony was harmless to the jury's determination of the aggravating circumstance of torture. Accordingly, the trial court erred in permitting the jury to consider this aggravator in its penalty determination.[11]

Martin also challenges the admission of his prior convictions for burglary and criminal trespass, which the

---

11. Appellants also challenge the trial court's jury instruction concerning torture, contending that the phrase "heinous, atrocious or cruel," used by the trial court to define torture, is unconstitutionally vague. Additionally, Appellants argue that when the jury asked for clarification of the meaning of intent to torture, the trial court's explanation, which employed the phrase "he or she or both of them," improperly suggested that a finding of intent to torture on the part of one defendant would suffice to establish the requisite intent on the part of both defendants. In light of our holding that the aggravating circumstance of torture was improperly before the jury, it is not necessary to address these issues.

Commonwealth offered into evidence to establish the aggravating circumstance of a significant history of felony convictions involving the threat or use of violence to the person. *See* 42 Pa.C.S. §9711(d)(9). He contends that, in order to establish a significant history of violent offenses, the Commonwealth must offer evidence of crimes involving the actual use or the actual threat of violence. Martin argues that the offenses of burglary and criminal trespass are not such crimes and, since the Commonwealth offered the fact of five burglary and five criminal trespass convictions alone,[12] the evidence was insufficient to establish the Section 9711(d)(9) aggravating circumstance.

This Court has previously had several occasions to consider whether the offense of burglary constitutes a crime of violence for purposes of Section 9711(d)(9). Initially, in *Commonwealth v. Christy*, 511 Pa. 490, 508, 515 A.2d 832, 841 (1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987), Justice Papadakos, writing for the Court, stated that, for a felony to be includable under Section 9711(d)(9), the Commonwealth was required to present evidence that the defendant actually threatened another with violence or actually used violence on another.[13] However, in *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553 (1988), Justice Papadakos, again writing for the majority, concluded that the portion of *Christy* in which the offense of burglary by itself was excluded as a crime of violence was dictum, and that "the crime of

12. The evidence was introduced through the Chief of the North Londonderry Township Police and the Lebanon County First Deputy Clerk of Courts, who both testified only that Martin had a prior record of such convictions. On cross-examination of the Chief of Police, the defense elicited the fact that no occupants were home at the time Martin committed these offenses.

13. In the majority's view in *Christy*, the language of Section 9711(d)(9) concerning the "threat of" violence was not the equivalent of the "potential for" violence. The majority noted that force was not an element of burglary and that every felony carries with it the potential for violence if the perpetrator is caught in the act. Accordingly, the majority concluded that violence must actually be threatened or used during the commission of the felony for such crime to be includable under subsection (d)(9). *See Christy*, 511 Pa. at 507–08, 515 A.2d at 840–41.

burglary has always been and continues to be viewed as a crime involving the use or threat of violence to the person." *Id.* at 15, 549 A.2d at 559. The principal reason offered for this holding was the observation that "[e]very ... burglar knows when he attempts to commit his crime that he is inviting dangerous resistance.... It is this threat of violence to persons that has prompted the Legislature into expanding the definition of burglary to include all those entries without privilege into places where people might be present." *Id.* at 14, 549 A.2d at 559.

This Court's subsequent holdings have consistently followed *Rolan. See Commonwealth v. Collins,* 549 Pa. 593, 606, 702 A.2d 540, 546 (1997)(holding that the defendant's juvenile convictions for burglary were crimes of violence for purposes of the Section 9711(d)(9) aggravating circumstance); *Commonwealth v. Bracey,* 541 Pa. 322, 349 n. 15, 662 A.2d 1062, 1075 n. 15 (1995)(relying upon *Rolan* to uphold a sentence of death where the jury found the aggravating circumstance of Section 9711(d)(9) based upon proffered evidence of two burglary convictions), *cert. denied,* 517 U.S. 1122, 116 S.Ct. 1356, 134 L.Ed.2d 524 (1996); *Commonwealth v. Rivers,* 537 Pa. 394, 415, 644 A.2d 710, 720 (1994) (citing *Rolan* for the principle that burglary involves the inherent threat of violence), *cert. denied,* 516 U.S. 1175, 116 S.Ct. 1270, 134 L.Ed.2d 217 (1996); *Commonwealth v. Baker,* 531 Pa. 541, 568, 614 A.2d 663, 676 (1992) (same); *Commonwealth v. Thomas,* 522 Pa. 256, 276, 561 A.2d 699, 709 (1989)(applying *Rolan* and concluding that a criminal trespass conviction is admissible as evidence of a crime of violence for purposes of Section 9711(d)(9)).[14] In accordance with these decisions, the evidence in this case was sufficient to support the jury's finding of the aggravating circumstance of Section 9711(d)(9).

**14.** The one exception is *Commonwealth v. Rompilla,* 539 Pa. 499, 653 A.2d 626 (1995), which discussed a claim of trial error in the submission of the Commonwealth's evidence concerning the (d)(9) aggravator with reference to the discussion set forth in the *Christy* case. Notably, trial in the *Rompilla* case commenced concurrent with the entry of this Court's decision in *Rolan.*

■ Next, Appellants make a number of arguments concerning the jury's penalty phase consideration of certain evidence. King claims that evidence of her prior convictions was improperly admitted in rebuttal of the mitigating evidence that she presented concerning her family relationships. She also claims that certain evidence, such as the photographs of the victim's body, the testimony concerning the victim's personal life, and the impeachment evidence concerning the parentage of her child, was extraneous to the aggravating circumstances identified at Section 9711(d), which are the only proper considerations militating in favor of the imposition of a death penalty. As such, King claims that this evidence was improperly incorporated into the penalty phase of trial. Lastly, both Appellants claim that the jury failed to find and give effect to certain mitigating factors that had been established by a preponderance of the evidence.[15]

■ All of these arguments are meritless. None of the complained-of evidence was improperly admitted or significantly prejudicial, and the trial judge issued adequate instructions informing the jury as to the range of proper considerations in sentencing. There is no basis, then, to support Appellants' contentions that the jury strayed beyond such range in the penalty phase. *See generally Baker*, 531 Pa. at 559, 614 A.2d at 672 (stating that the law presumes that juries follow the trial court's instructions as to the applicable law). Furthermore, the weight to be accorded the aggravating and mitigating factors presented is a function that is reserved solely for the jury. *Commonwealth v. Banks*, 513 Pa. 318, 354, 521 A.2d 1, 19, *cert. denied*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987). Thus, we will not disturb the conclusions that the jury reached concerning Appellants' evidence of mitigating circumstances.

**15.** For example, Martin offered evidence that he was sexually abused during his childhood, resulting in unfavorable personality and behavioral changes that persisted and worsened despite extensive counseling. King offered evidence that she also experienced a difficult childhood, was physically and sexually abused, and was the mother of several children.

King also contends that certain comments made by the prosecutor during closing argument in the penalty phase were improper. Specifically, King contends that the prosecutor improperly vouched for the propriety of a death sentence, commented upon King's failure to express remorse, and suggested that the death penalty should be imposed in this case to counteract a societal trend away from personal responsibility.

Challenged prosecutorial comments must be considered in the context in which they were made. *Commonwealth v. Morales,* 549 Pa. 400, 424, 701 A.2d 516, 528 (1997). "[A] prosecutor's statements to the jury will not be considered improper unless their unavoidable effect is to prejudice the jury so that a true verdict cannot be rendered because the existence of bias and hostility makes it impossible to weigh the evidence in a neutral manner." *Commonwealth v. Travaglia,* 541 Pa. 108, 134, 661 A.2d 352, 365 (1995), *cert. denied,* 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). Furthermore, during the penalty phase, where the presumption of innocence is no longer applicable, the prosecutor is permitted even greater latitude in presenting argument. *Id.*

Our review of the record reveals nothing improper in the prosecutor's closing remarks. It is axiomatic that a prosecutor may argue in favor of the death penalty, and must be afforded reasonable latitude in arguing his position to the jury. *Commonwealth v. Jones,* 542 Pa. 464, 515, 668 A.2d 491, 516 (1995), *cert. denied,* 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). Taken in context, the prosecutor's remarks that "[i]t is not easy for me to stand here and request a death penalty" and "I suggest to you respectfully that if there is a case in where the death penalty is appropriate, it is this one" were nothing more than a reflection on the somberness of the occasion and an argument for the appropriateness of the death penalty, both of which are permissible. *See Commonwealth v. Sneed,* 514 Pa. 597, 613, 526 A.2d 749, 757 (1987). With respect to the prosecutor's contrasting King's display of tears when discussing her own background with her

emotionless description of Goodman's murder, we note that this Court has consistently recognized that a prosecutor may comment upon a defendant's lack of remorse. *See Hill,* 542 Pa. at 314, 666 A.2d at 653. The prosecutor's remarks that individual responsibility for one's actions is paramount in our society were appropriate, given the fact that King had presented evidence throughout the trial that her level of participation and responsibility regarding the murder was minimal. It is permissible for a prosecutor to argue in response to an anticipated defense position. *Marrero,* 546 Pa. at 611, 687 A.2d at 1109.

Finally, Appellants argue that the cumulative effect of alleged errors during the guilt and penalty phases of trial undermines the integrity of the convictions and sentences. Such arguments generally have been rejected in favor of an individualized assessment of the merits of claimed trial errors. *See generally Commonwealth v. Murphy,* 540 Pa. 318, 336 n. 6, 657 A.2d 927, 936 n. 6 (1995)(citing *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716 (1992)). Moreover, in this case, we have reviewed each of Appellants' claims of error and have dismissed each as meritless, save one, namely, the trial court's error in submission of the aggravating circumstance of torture to the jury.

## INDEPENDENT REVIEW OF THE DEATH SENTENCE

We must affirm the judgment of sentence unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. §9711(h)(3).[16]

■■■ Upon review of the record, we conclude that the sentence imposed in this case was not the product of passion, prejudice or any other arbitrary factor, but rather was based upon the evidence that Appellants killed the victim with premeditation during the robbery.

■■■■ Although we have concluded that the aggravating circumstance of torture was improperly before the jury, the remaining aggravating circumstance found by the jury with respect to both defendants, commission of the homicide during the perpetration of a robbery, was indisputably proven. Additionally, with respect to Martin, we have sustained the jury's determination as to the aggravating circumstance of a significant history of felony convictions involving the use or threat of violence. In this situation, where one or more aggravating circumstances remain and the jury has found no mitigating circumstances, the death sentences are to be affirmed. *See Christy*, 511 Pa. at 510, 515 A.2d at 842; *see also Bracey*, 541 Pa. at 349 n. 15, 662 A.2d at 1075 n. 15 (citing *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704 (1992), for the proposition that invalidation of one aggravating circumstance does not warrant reversal where an additional aggravating circumstance has been validly found by the jury and no mitigating circumstances have been found).

■■■ Finally, having reviewed Appellants' sentences in light of the sentencing data compiled and monitored by the Administrative Office of the Pennsylvania Courts, we conclude that the sentences of death imposed upon Appellants are not excessive or disproportionate to the penalty imposed in similar cases. *See Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d

16. By legislation enacted June 25, 1997, subsection (h)(3)(iii) providing for proportionality review and a portion of subsection (h)(4) that references such review were stricken from Section 9711(h). *See* Act of June 25, 1997, No. 28, §1 (Act 28), effective immediately. However, this Court will continue to undertake proportionality review in cases where the death sentence was imposed prior to the effective date of Act 28. *Commonwealth v. Gribble*, 550 Pa. 62, 89–91, 703 A.2d 426, 440 (1997).

700, 707–08, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdicts and sentences of death imposed upon Bradley Martin and Carolyn King by the Court of Common Pleas of Lebanon County.[17]

Chief Justice FLAHERTY files a concurring opinion in which Justice NIGRO joins.

Justices ZAPPALA, CASTILLE and NEWMAN file concurring opinions.

FLAHERTY, Chief Justice, concurring.

While I join Mr. Justice Saylor's majority opinion, I write separately to clarify my position on defining "life imprisonment" in capital cases. In terms of appellant's argument that he was entitled to an instruction on the meaning of "life imprisonment," I agree with Mr. Justice Saylor's disposition of the issue since it is consistent with precedent.

I would, however, require a *Simmons* instruction in every capital case. Mr. Justice Nigro cogently explained the rationale for such a rule in his concurring opinion in *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 43–44 (Pa.1998)(Nigro, J., concurring), which I joined:

> However, I would suggest that the better practice and policy is to require trial courts to give a *Simmons* instruction in all death penalty proceedings, regardless of whether counsel raises the issue of a defendant's potential future dangerousness during the penalty phase.
>
> Under this practice, a jury considering the death penalty would automatically be informed, before deliberations began, of what life imprisonment actually means in Pennsylvania at the time of the instruction. In my opinion, a standard *Simmons* instruction would, in the first instance, serve to clarify that issue for the jury. For example, since commutation is, at this time, a possibility in Pennsylvania for those

17. Pursuant to Section 9711(i), 42 Pa.C.S., the Prothonotary is directed to transmit the complete record of this case to the Governor of Pennsylvania within ninety days.

serving life sentences, and therefore proper for the jury's consideration, trial judges giving a *Simmons* instruction could be equipped with statistical information relating to the percentage of life sentences which had been commuted within the last several years. Not only would the jury be aided by knowing those percentages during their penalty deliberations, but the defendant should be entitled to have the jury aware of what statistical possibility exists that a life sentence imposed on him would result in commutation. Moreover, I can see no prejudice that the Commonwealth would suffer if every defendant facing a sentence of death received a *Simmons* jury instruction explaining, as thoroughly as possible, what "life imprisonment" means in Pennsylvania.

(Footnotes omitted). I think it is self-evident that *every* juror in the penalty phase of a capital case is *always* concerned with the issue of future dangerousness.

Justice NIGRO joins in this concurring opinion.

ZAPPALA, Justice, concurring.

I join the majority opinion except for the discussion of whether the evidence was sufficient to support the jury's finding of the aggravating circumstance of torture. Maj. Opinion at 780–781. As the majority does with the Appellant's claims of error regarding the trial court's instructions, see footnote 10, I believe it is unnecessary to address this issue in light of the conclusion that "the trial court erred in permitting the jury to consider this aggravator in its penalty determination." *Id.* at 782.

CASTILLE, Justice, concurring.

I agree with the majority that the verdicts and sentences of death should be upheld as to both appellants. I write separately because I disagree with the majority's conclusion that the aggravating circumstance of torture was not properly placed before the jury. Although Dr. Mihalakis' expert testimony on the issue of whether the victim experienced fear and terror while being suffocated was improperly admitted, I

would find this error to be harmless beyond a reasonable doubt.

Here, the trial court erred by allowing Dr. Mihalakis to proffer expert testimony on a matter of common knowledge. By tying the victim's hands behind his back and slowly suffocating him until the life finally ebbed out of him, appellants subjected the victim to a degree of terror and fear in the waning moments of his life which a juror does not require an expert to explain. In other words, Dr. Mihalakis did not tell the jurors anything which they did not already know by telling them that a human being would experience fear and terror as he is brutalized and suffocated. However, the same fact which renders the admission of Dr. Mihalakis' testimony erroneous also renders such admission harmless. While an expert should generally not be permitted to testify as to a matter of common knowledge, allowing an expert to testify about truths as transparent as those at issue here should not be deemed prejudicial. To the extent that *Collins v. Zediker*, 421 Pa. 52, 218 A.2d 776 (1966) holds to the contrary, I believe that case should be overruled.

Thus, I disagree with the majority's conclusion that, due to the improper admission of Dr. Mihalakis' testimony, the aggravating circumstance of torture was not properly before the jury. I concur with the remainder of the majority's reasoning and with the result reached thereunder.

NEWMAN, Justice, concurring.

I join the majority, and write separately only to reiterate the position I expressed in *Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040, regarding the "life means life" issue. As I stated in *Chandler*:

[I]n cases where *Simmons* would require a "life means life" instruction, I agree with Chief Justice Flaherty that the court should instruct the jury that the defendant's sentence could be commuted. Where future dangerousness is at issue, the impossibility of parole and the possibility of

commutation are equally relevant, so the court should inform the jury of both contingencies.

In this case, I agree with the majority that future dangerousness was not at issue. Accordingly, I agree that the trial court properly declined to give a "life means life" instruction.