860 A.2d 31

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Daniel DOUGHERTY, Appellant.**

Supreme Court of Pennsylvania.

Argued April 7, 2003.

Decided Oct. 20, 2004.

Reargument Denied Dec. 9, 2004.

184

Bernard L. Siegel, Philadelphia, for Daniel Dougherty, Appellant.

Hugh J. Burns, Philadelphia, Amy Zapp, Harrisburg, Lorie K. Dakessian, for the Com. of PA, Appellee.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Justice CASTILLE.

This is a direct appeal from sentences of death imposed by the Philadelphia County Court of Common Pleas. On October 5, 2000, following a capital jury trial, appellant was convicted of two counts of first-degree murder [1] and one count of arson [2] arising from an August 24, 1985 house fire in which appellant's two young sons, John (age 3) and Daniel, Jr. (age 4) were killed. At the penalty phase, the jury found three aggravating circumstances and one mitigating circumstance.[3] The jury

1. 18 Pa.C.S. § 2502.

2. 18 Pa.C.S. § 3301.

3. The jury unanimously found the following aggravating circumstances: appellant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); in the commission of the offense, appellant know-

found that the aggravating circumstances outweighed the mitigating circumstance, and accordingly, imposed sentences of death for appellant's first-degree murder convictions. On October 6, 2000, the trial court formally imposed the death sentences and, in addition, imposed a concurrent term of ten to twenty years' incarceration for appellant's arson conviction. Appellant did not file post-sentence motions. This appeal followed.[4] For the reasons set forth below, we affirm the verdict and sentences of death.

We begin, as we do in all death penalty direct appeals, by independently reviewing the evidence to ensure that it is sufficient to support the first-degree murder convictions. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). When reviewing the sufficiency of the evidence, this Court must determine whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 864 (2000). A person is guilty of first-degree murder where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). Moreover, the Crimes Code provides that a person who commits arson endangering persons is guilty of first-degree murder "if the

ingly created a grave risk of death to another person in addition to the victim of the offense, *Id.* § 9711(d)(7); and appellant has been convicted of another murder committed in any jurisdiction and committed either before or at the same time as the offense at issue. *Id.* § 9711(d)(11). One or more jurors found as a mitigating circumstance any other evidence of mitigation concerning the character and record of appellant. *Id.* § 9711(e)(8).

4. Pursuant to 42 Pa.C.S. § 9711(h), this Court has automatic jurisdiction to review the trial court's judgment of sentence of death.

fire or explosion causes the death of any person and was set with the purpose of causing the death of another person." 18 Pa.C.S. § 3301(a)(2). To prove the underlying arson in a murder prosecution, the Commonwealth must establish that (1) there was a fire of incendiary origin; (2) the accused deliberately caused the fire; and (3) the fire was the cause of death. *Commonwealth v. Pierce,* 537 Pa. 514, 645 A.2d 189, 194 (1994).

The evidence adduced at trial established the following facts. On August 24, 1985, at approximately 11:30 p.m., appellant was at a bar with a friend when his live-in girlfriend, Kathleen Schuler,[5] angrily confronted him. Schuler testified that appellant was supposed to have attended an Alcoholics Anonymous meeting that night. When she instead found him at a bar, she told him to "get the fuck home with his kids because [she] was leaving him." N.T. 10/3/00, at 101. Schuler then returned to her house—a row-home that she shared with appellant in the Oxford Circle section of Philadelphia—packed her clothes and left appellant's two boys alone with a teenage babysitter, Dianne Carpenter. At 1:30 a.m., Carpenter, tired of waiting for appellant to arrive, returned to her home next-door and left the children, who were sleeping upstairs.

On his way home from the bar, meanwhile, appellant visited his estranged wife, Kathleen Dipple [6]—the mother of his children. Appellant told Dipple that Schuler wanted him out of the house and he persuaded her to accompany him to the Oxford Circle home so that she could take custody of their children. When the two arrived, appellant found a note from Schuler demanding that appellant leave her house. Appellant showed Dipple the note and pleaded with her to stay with him. Dipple declined and asked appellant to bring the children

5. The record also refers to Ms. Schuler as Kathleen Paluba and Kathleen McGovern. Paluba was her maiden name, Schuler was her married name at the time of the fire, and McGovern was her married name at the time of trial. For ease of reference, we will refer to her as Ms. Schuler.

6. In 1985, Ms. Dipple's last name was Dougherty. For ease of reference, however, we will refer to her as Dipple, her name at the time of trial.

downstairs. When appellant told Dipple to go upstairs instead, she refused because she was afraid that appellant would try to "come on" to her. N.T. 10/04/00, at 28. Finally, tired of appellant's sexual advances, Dipple left the house, promising that she would return the next morning for her scheduled visitation with the children. Thereafter, appellant was the only adult in the house.

At approximately 3:57 a.m., police responded to reports of a fire at the Oxford Circle home. By the time the first officer arrived at the scene, the house was fully engulfed in flames. Appellant was standing outside, bare-chested. When police asked appellant for his name, he replied, "My name is mud. I should die for what I did." N.T. 10/2/00, at 102. Appellant's two children were subsequently found dead in their bedroom. A medical examiner concluded that they died from smoke inhalation and carbon monoxide poisoning, and may have been burned by the fire while they were still alive.

Appellant told police that he had fallen asleep on the sofa after Dipple's departure and that he later awoke to see the nearby curtains on fire. He conceded that he had not called the fire department, but instead immediately ran out of the house. Appellant claimed, however, that he then unsuccessfully attempted to extinguish the fire and rescue his sons.

John Quinn, a Philadelphia Fire Department fire marshal, who testified as an arson expert, testified to a reasonable degree of scientific certainty that the fire was of incendiary origin, i.e., it was intentionally set. He noted that the fire had three separate ignition points: a love seat, a sofa and a dining room table. Quinn testified that appellant's claim to have been on the sofa when he noticed that the curtains were ablaze was not credible because, based upon the ignition points and the fire patterns, the sofa would have been fully consumed in flames before the curtains caught fire. Quinn further testified that a person on the sofa at the time the curtains initially ignited would have been "severely burned or a fatality." *Id.* at 169–70. According to Quinn, the person who started the fire would in all likelihood have been the only person who could have had enough time to escape the burning home

without injury. *Id.* at 179. Notably, appellant had not suffered any burns nor did his body bear any mark of exposure to smoke or fire.

Two men who were incarcerated with appellant prior to his trial testified that he admitted to them that he had murdered his sons. Daniel Allen, a cellmate, testified that appellant had tearfully confessed that "he murdered his kids" in a fire because "he was jealous of his girlfriend or his wife." *Id.* at 151–52. Similarly, Robert Amoroso, who shared a cell with appellant at another jail facility, testified that, on one occasion, he heard appellant crying. Amoroso said that when he asked appellant what was wrong, appellant replied, "I burned my two babies up." *Id.* at 185. Amoroso also testified that appellant conveyed his regret that he had not killed his wife instead, because she was amorously involved with another man and because he "was paying all the bills and she wasn't taking care of the kids." *Id.* at 186.

This evidence, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports appellant's first-degree murder convictions. The evidence established that the fire was of incendiary origin, that appellant deliberately set the fire, and that he did so with the specific intent to kill his sons, while they were upstairs sleeping.[7] Further, the evidence established that the fire was the cause of the boys' death. Accordingly, the evidence was sufficient to sustain appellant's convictions for murder in the first degree.

In addition to the record review of evidentiary sufficiency that this Court undertakes *sua sponte*, we are presented with a specific claim from appellant which challenges the sufficiency of the evidence. Appellant claims that the evidence was insufficient to support the two counts of first degree murder or the arson count because there was no "credible" evidence to

7. The jury could infer specific intent from the circumstances of the crime—*i.e.*, that appellant deliberately set fire to his home, knowing that his children were upstairs sleeping at the time—as well as the fact that he made incriminating statements to the police and admitted his guilt to two cellmates at two separate facilities.

suggest that he had any motive to hurt his sons; his mere presence in the house at the time of the fire was insufficient to establish his guilt; and his efforts to stem the fire after first running from the house support the conclusion that the deaths of his sons were unintentional. Essentially, appellant disputes the evidence that demonstrates his responsibility for setting the fire.

Aspects of appellant's sufficiency claim in fact challenge only the weight, not the sufficiency, of the evidence. The weight of the evidence is exclusively for the finder of fact, who is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses. *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97, 101 (1995). This Court cannot substitute its judgment for that of the jury on issues of credibility. *Commonwealth v. Pronkoskie*, 498 Pa. 245, 445 A.2d 1203, 1206 (1982). Here, the jury heard expert testimony from the fire marshal which raised the strong inference that appellant had intentionally started the fire, *i.e.*, the fire was intentionally set and appellant, who was the only adult present, escaped without injury even though he claimed to have been in the house well after the fire had spread. Additionally, the jury heard testimony that, as the fire still raged, appellant stated, "My name is mud. I should die for what I did." Appellant's argument concerning motive is unavailing in the context of a sufficiency challenge; although motive evidence may be relevant to guilt, the Commonwealth is not required to provide such evidence in order to prove its case. In any event, as to both motive and intent, the jury heard, among other evidence, testimony from fellow inmates that appellant had admitted to killing his children in a fire, and that he had done so to retaliate against his estranged wife and/or his girlfriend. In reaching its verdict, the jury was free to weigh and credit this evidence. Likewise, it was free to weigh and reject appellant's own testimony that he did not start the fire and had attempted to extinguish it.[8] Moreover,

8. Notably, appellant's initial statement to police about his futile rescue attempts conflicted with his testimony at trial. In his initial statement to police, appellant claimed that, when he awoke to see the curtains on

appellant's claim that he attempted to save his children after first escaping from the burning house, even if believed, would not necessarily undermine the conclusion that he set the fire and did so with the specific intent to kill his children. Therefore, appellant's sufficiency claim fails.

Appellant next claims that the trial court erred in failing to instruct the jury at the penalty phase that life imprisonment in Pennsylvania means life without the possibility of parole. Appellant alleges that the court's failure to provide such an instruction violated his due process rights under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In addition, appellant contends that the trial court's failure to provide a *Simmons* instruction violated the due process proscription against sentences imposed under a material misapprehension of law or fact, that it arbitrarily denied appellant's due process right to be sentenced by a jury exercising discretion between the statutorily prescribed options of life without possibility of parole and death, that it unconstitutionally deprived the jury of accurate sentencing information, and that it violated the requirement under the Eighth Amendment to the U.S. Constitution that a capital sentencing jury be permitted to consider and give effect to all relevant mitigating circumstances.

An instruction defining what constitutes a life sentence in Pennsylvania is required only where the prosecution makes the defendant's future dangerousness an issue in the case and the defendant specifically requests such an instruction. *See Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040, 1046 (1998); *Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221, 1232 (1996). Appellant's present claim is waived due to his failure to request a *Simmons* instruction at trial.

fire, he ran out the front door, went next-door, took the neighbor's hose and attempted to extinguish the fire. When this effort failed, he said, he returned to the neighbor's house, took a ladder, and then unsuccessfully attempted to climb to his sons' third-story bedroom. Appellant stated that, despite these efforts he could not get back into the house. *See* N.T. 10/2/00, at 128–29. At trial, however, appellant testified that he reentered the house twice, once making it back into the living room, which he said was engulfed in flames by this time, and then later, entering the burning dining room through another door.

*See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 849 n. 15 (2003). Nevertheless, because appellant filed his brief before this Court prospectively abrogated the direct capital appeal relaxed waiver doctrine in *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), the failure to raise a contemporaneous objection at trial is not an absolute bar to considering a waived claim on direct appeal. However, in *Commonwealth v. Spotz,* this Court noted that the discretionary relaxed waiver doctrine "has no applicability" with respect to a *Simmons* claim, given the unique nature of such a claim, which requires a specific request for such an instruction from the trial court:

> The trial court's obligation to issue a *Simmons* charge is triggered only upon the existence of *twin* requirements, *i.e.,* future dangerousness being placed at issue, and a defense request. These are substantive requirements, not procedural ones.

*Spotz,* 759 A.2d at 1291 n. 14 (emphasis original); *see also Freeman,* 827 A.2d at 407 (noting that a waived *Simmons* claim "is not subject to accurate review under relaxed waiver" because "[a]n instruction defining what a life sentence means in Pennsylvania is required only where the prosecution makes the defendant's future dangerousness an issue in the case and the defendant specifically requests such an instruction").

■ Here, in claiming that the Commonwealth argued future dangerousness, appellant cites the following portion of the Commonwealth's penalty phase argument regarding the aggravating factor that appellant had a significant history of felony convictions involving the use or threat of force:

> I reminded you over and over and over again about the heinous nature of this double murder. I won't remind you again, but in addition to that he's committed two other felonies after he committed the double murder in this case. What you heard on the stand were words. Actions tell you all you need to know about [appellant].

N.T. 10/6/00, at 61. (Though pursued by the Commonwealth, we note that the jury did not find this particular aggravating circumstance.) Appellant did not object to this argument or request a *Simmons* instruction in response to it, and therefore, the trial court did not "err" in failing to issue the instruction. In the absence of a contemporaneous objection, this claim is not subject to review.[9]

Appellant, who is represented by new counsel upon appeal, also raises several allegations of ineffective assistance of trial counsel. Specifically, appellant alleges that trial counsel was ineffective for failing to prepare adequately for both the guilt phase and the penalty phase of the trial, and for failing to investigate and develop mitigation evidence for the penalty phase. In addition, at the end of his *Simmons* claim, appellant states that his trial counsel's failure to request a *Simmons* charge constituted ineffectiveness *per se*. This Court recently abrogated the procedural rule requiring new counsel

---

**9.** We note that, under this Court's existing precedent, the prosecutor's argument in this case would be deemed insufficient to place appellant's future dangerousness at issue. *See Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 795 (1998) (future dangerousness not at issue when Commonwealth argued aggravating circumstance that appellant had significant history of felony convictions involving use or threat of force); *see also Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 778 (1998), cert. denied, 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44, 47 (1998), cert. denied, 525 U.S. 1078, 119 S.Ct. 818, 142 L.Ed.2d 676 (1999). Evidence of a history of felony convictions does not necessarily implicate future dangerousness.

However, we are aware that, after this case was tried, the U.S. Supreme Court revisited the question of the sufficiency of the evidence and/or argument required to implicate an entitlement to a *Simmons* instruction. *See Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002). In that 5–4 decision, the Court majority suggested what is arguably a more relaxed standard for assessing when *Simmons* is implicated. *See id.* at 253–54, 122 S.Ct. at 731–32 (rejecting state's argument that future dangerousness is implicated only if evidence is introduced to support no other possible inference; "Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms."). However, the question of whether *Kelly* would require an adjustment in this Court's approach to the sufficiency of a record to require a *Simmons* instruction is not implicated here, where no appropriate objection was registered.

to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel is appointed. *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002) (overruling *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977)). In *Grant,* this Court announced a new general rule providing that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." 813 A.2d at 738. We also held that the new rule applies retroactively to "any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved." *Id.* In *Bomar, supra,* this Court recognized a limited exception to *Grant:* we held that claims of counsel ineffectiveness could be entertained on direct appeal if the claims were raised in the court below, a hearing was held at which trial counsel testified, and the trial court passed upon the merits of the claims. 826 A.2d at 853–55.

In the case *sub judice,* the trial court addressed appellant's ineffectiveness claims in the Pa.R.A.P.1925(b) opinion that it filed in response to appellant's statement of matters complained of on appeal, finding them to be meritless. Nevertheless, the *Bomar* exception does not apply since the claims were not raised when the matter was within the jurisdiction of the trial court and, as a consequence, the court did not hold an evidentiary hearing at which trial counsel testified. Accordingly, to facilitate a more appropriate and complete review of appellant's collateral claims, we dismiss appellant's instant claims of ineffective assistance of counsel without prejudice to his right to raise those claims in a petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*

In his final claim, appellant argues that the trial court erred in denying his motion to dismiss all charges, based upon an unreasonable delay in arresting appellant. Appellant argues that the thirteen-plus years of delay was improper under *Commonwealth v. Scher,* 569 Pa. 284, 803 A.2d 1204 (2002). Appellant further avers that he was prejudiced by the delay because "key witnesses" for the defense were unavailable by the time of trial. Appellant identifies those unavailable wit-

nesses as two neighbors whose police statements on the night of the fire recounted that appellant had frantically attempted to extinguish the fire and tried to rescue his children. Appellant further claims that the Commonwealth acted in bad faith because the delay was based upon no new information other than a January 1999 police interview with another former wife, Adrienne Sussman–Dougherty. Sussman–Dougherty had contacted Philadelphia homicide detectives and informed them that, several times during the course of her marriage to appellant, which lasted from 1991 to 1995, appellant had confessed to her that he had started the fire that killed his two sons. Appellant deems the police information from his ex-wife to be evidence of the Commonwealth's bad faith in delaying his arrest because the Commonwealth determined that Sussman–Dougherty's testimony would be inadmissible at trial under the spousal communications privilege; [10] and that the credibility of the statement allegedly was suspect. Appellant notes that the other information detailed in his warrant of arrest had been known to police all along and thus does not demonstrate good faith for the thirteen year delay in charging appellant with murder.

The Commonwealth counters that this claim is not reviewable because the trial court in fact did not deny appellant's motion to dismiss for pre-trial delay, but instead appellant abandoned the claim. The Commonwealth argues that, after a pre-trial investigation, appellant abandoned the motion to dismiss, and accordingly, the trial court never ruled upon the motion. In the alternative, the Commonwealth argues that appellant had good reason to abandon the issue because he was not prejudiced by the delay and the delay was not caused by bad faith on the part of the Commonwealth. In this regard, the Commonwealth notes that the testimony appellant alleges he would have introduced if the trial had occurred earlier was merely cumulative of evidence which was later presented at trial, i.e., other witnesses testified that appellant had attempted to rescue his children from the fire. Moreover, the Commonwealth contends that appellant's claim is specula-

10. In point of fact, Sussman–Dougherty did not testify at trial.

tive because he fails to show how the additional evidence would have aided his defense. Further, the Commonwealth argues that it did not act in bad faith because it did not intentionally delay appellant's arrest to gain some tactical trial advantage, but rather, arrested him as soon as it had reason to believe (through Sussman–Dougherty's account of appellant's confessions) that he not only purposely set his house on fire, but did so with the specific intent to kill his children. As for the admissibility of Sussman–Dougherty's accounts of appellant's admissions to her, the Commonwealth notes that this account was used (and used properly) only to support a determination of probable cause to arrest appellant and, therefore, its admissibility or inadmissibility at trial is irrelevant to the question of bad faith.

We agree with the Commonwealth that this claim is unreviewable in its present form, even under this Court's former practice of relaxing waiver principles upon direct capital appeal. The docket and record reflect that appellant indeed moved to dismiss the prosecution on the basis of pre-arrest delay.[11] Although appellant asserts that the trial court denied the motion, he cites to no support in the official record for that assertion, and this Court's review has uncovered no such ruling. There is no indication in the trial court's hand-written docket entries, or in the docket generated for purposes of appeal, that the motion was ever ruled upon. Instead, the only further record reference to the motion to dismiss is, as the Commonwealth notes, an in-chambers discussion of record on the first day of trial after the jury was selected, in which the trial court ruled upon various outstanding pre-trial issues. During that discussion, counsel for the Commonwealth noted that appellant had "raised the issue of prearrest delay, due process" but had "then waived it after investigating." N.T. 10/2/00, at 31. Appellant's trial counsel did not dispute the record representation that he had waived the pre-arrest delay claim.

**11.** The record contains both a counseled motion to dismiss and a *pro se* motion which appellant later filed.

■ For purposes of determining whether this claim is reviewable, it is significant that this is a case where counsel specifically raised the issue of pre-trial delay, but then withdrew the motion, as opposed to a case where counsel made no such motion at all. Because counsel withdrew the motion, there is no record devoted to the issue. It is not clear from the existing record which considerations motivated counsel to abandon the claim. In an instance such as this, it is unrealistic and inaccurate to view the claim as a claim of trial court error. Counsel apparently investigated the issue and then made a judgment that the issue was not worth pursuing. Accordingly, the focus should be upon counsel's reasons for electing not to pursue the issue, rather than upon some alleged "error" of the trial court in declining to grant the withdrawn motion. As this Court noted in *Freeman, supra,* we have routinely declined to apply the discretionary relaxed waiver doctrine "in many instances, often involving situations where the failure to raise a claim below might have fallen within the realm of defense trial strategy, or when the absence of a contemporaneous objection made it difficult to resolve the issue on the record presented." 827 A.2d at 400 n. 9 (collecting cases). *See also Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426, 434–35 (1997) (citations omitted) (relaxed waiver did not apply to appellant's suppression claim because he withdrew pre-trial motion to suppress and, as result, Commonwealth was denied opportunity to respond and this Court was left without proper evidentiary record). Therefore, we dismiss this claim without prejudice to appellant's ability to pursue it under PCRA as a claim sounding in ineffective assistance of counsel, if he chooses to do so.

■ Finally, this Court must conduct a statutory review of the death sentences. Pursuant to 42 Pa.C.S. § 9711(h)(3), this Court must affirm the sentences of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails

to support the findings of at least one aggravating circumstance specified in subsection (d).

*Id.* After careful review of the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. We also conclude that the evidence was sufficient to establish the aggravating circumstances found by the jury: *i.e.*, that appellant committed a killing while in the perpetration of a felony; in the commission of the offense appellant knowingly created a grave risk of death to another person in addition to the victim of the offense; and, appellant had been convicted of another murder committed in any jurisdiction and committed either before or at the same time of the offense at issue. Since the jury found that the three aggravating factors outweighed the mitigating factor, it was statutorily required to impose the sentences of death. 42 Pa.C.S. § 9711(c)(1)(iv). We see no record-based reason to negate that determination.

Accordingly, we affirm the verdict and sentences of death imposed upon appellant by the Court of Common Pleas of Philadelphia County.[12]

Former Justice LAMB did not participate in the decision of this case.

---

12. The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court in accordance with 42 Pa.C.S. § 9711(i).