J-A26035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DANIEL DOUGHERTY | : | |
| | : | |
| Appellant | : | No. 1377 EDA 2019 |

Appeal from the Judgment of Sentence Entered April 8, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0705371-1999

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED NOVEMBER 23, 2020**

Appellant Daniel Dougherty appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County on April 8, 2019, following his convictions of two counts of Third Degree Murder and one count of Arson[1] after his third jury trial in connection with the deaths of his two children.[2]  Following a careful review, we affirm.

The trial court summarized the extensive procedural history and detailed the salient facts herein as follows:

> [Appellant] was sentenced to two consecutive life sentences for the second-degree murder convictions as well as a concurrent ten to twenty year incarceration for arson. [Appellant] had been originally tried and sentenced to death in 2000 for these offenses. On direct appeal the judgment of sentence was affirmed by the Pennsylvania Supreme Court with the petition for certiorari denied

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A.§§ 2502(c) and 3301, respectively.
[2] The boys were ages three and four at the time of their death.

by the United States Supreme Court on October 3, 2005. Following the filing of a Post-Conviction Hearing Act petition, the parties agreed to reduce [Appellant's] two death sentences to two life sentences without the possibility of parole. Subsequently, these convictions were overturned due to ineffective assistance of counsel in failing to adequately cross-examine the Fire Marshall's testimony as to the cause of the fire. A second trial was held in 2016, following which [Appellant] appealed to the Superior Court, who again granted a new trial. [Appellant's] third jury trial commenced March 25, 2019, resulting again in convictions for two counts of second degree murder and arson. [Appellant] was again sentenced to two consecutive life sentences on the murder charges as well as a concurrent ten to twenty years' incarceration for arson. This appeal followed.

**PROCEDURAL HISTORY**:

[Appellant] was arrested and charged with arson, murder and related offenses that had resulted in the death of the [Appellant's] two children, John and Daniel, aged three and four respectively, on July 21, 1999, more than thirteen years after a fire engulfed his girlfriend's residence of 929 ½ Carver Street in Philadelphia. [Appellant's] first jury trial, in October of 2000, resulted in two convictions of murder of the first degree as well as arson and a sentence of death for each of the two victims. The Pennsylvania Supreme Court affirmed the judgment of sentence on October 20, 2004. *Commonwealth v. Dougherty*, 580 Pa. 183, 860 A.2d 31 (2004). [Appellant's] petition for certiorari was denied by the United States Supreme Court on October 3, 2005. *Dougherty v. Pennsylvania*, 546 U.S. 835, 126 S.Ct. 63, 163 L.Ed.2d 89 (2005).

In November of 2005, [Appellant] filed a *pro se* petition under the Post-Conviction Relief Act (hereinafter, for the sake of brevity referred to as "PCRA"), with an amended counseled petition filed a year later. In April of 2009, the court dismissed the petition and on April 28, 2011, the Pennsylvania Supreme Court remanded the matter for appointment of a new PCRA judge to develop the record. By agreement of the parties, on February 7, 2012, [Appellant's] death sentences were vacated and a new sentences [sic] of life imprisonment imposed. Further hearings were conducted on the ineffective assistance of counsel claims and the PCRA court dismissed the petition on September 6, 2012. On December 30, 2013, the Superior Court vacated the PCRA court's dismissal and directed the court to order a new trial.

A new jury trial was held from March 21, 2016 through April 11, 2016, whereupon the jury found [Appellant] guilty of two counts of murder of the second degree and arson. [Appellant] was sentenced to consecutive life sentences for the murders of his two sons and a concurrent sentence of ten to twenty years' incarceration for the arson. [Appellant] appealed that conviction and the Superior Court granted [Appellant] a new trial. *Commonwealth v. Dougherty*, 1648 EDA 2016.

[Appellant's] third jury trial commenced March 25, 2019. Appellant was again convicted of two counts of second degree murder and arson. [Appellant] was once more sentenced to two consecutive life sentences on the murder charges as well as ten to twenty years' incarceration for arson. This timely appeal followed.

* * *

**FACTS**:

The facts, when viewed in the light most favorable to the Commonwealth as the verdict-winner, show that on the evening of August 24, 1985, [Appellant] was supposed to return to his girlfriend's home after attending an Alcoholics Anonymous meeting and tend to his two children, as well as the child of his live-in girlfriend, Kathleen McGovern. (N.T. 3-27-2019 PM, pp. 58). [Appellant] did not go home. At approximately 11:30 p.m., [Appellant] was in a bar when Ms. McGovern stormed in and angrily confronted him, telling [Appellant] to get home with his kids because she was leaving him. (N.T. 3-27-2019 PM, pp. 59-64). McGovern returned to her Oxford Circle home, packed up some of her belongings and left with her child, leaving the two young Dougherty boys asleep in their second-floor bedroom with a teenage babysitter. (N.T. 3-27-2019 PM, pp. 64-71). By 1:30 am., the babysitter could stay no longer and returned to her residence next door, leaving a note for [Appellant] explaining to him what had occurred. (N.T. 3-27-2019 PM, pp. 35-40).

Leaving the bar, [Appellant] did not go home, but to the home of his estranged wife, the mother of the two children, Kathleen Dippel. (N.T. 3-28-2019 AM, pp. 74-77). [Appellant] pleaded with his estranged wife to come with him and take the children as his girlfriend had kicked him out. [Appellant] got mad at Dippel for not wanting to come with him and get the children in the middle of the night, and returned home. He did not stay home, reappearing at the house of his wife. (N.T. 3-28-2019 AM, pp. 77-78). Dippel finally agreed and came with [Appellant] to take custody of the two children. Once they got to McGovern's house,

[Appellant] asked Dippel to spend the night. Ms. Dippel declined [Appellant's] advances and asked [Appellant] to bring the children downstairs. [Appellant] refused, unceasingly demanding Dippel go upstairs to retrieve the children. (N.T. 3-28-2019 AM, pp. 87-88). In fear of being sexually assaulted by [Appellant], Dippel refused to go upstairs. (N.T. 3-28-2019 AM, pp. 88-91). Weary of [Appellant's] advances, Dippel left, barefoot and without the children. Thereafter, [Appellant] was the only adult in the house while the children slept upstairs.

At approximately 3:57 a.m., police responded to reports of a fire at the residence. By the time the police responded, the house was in flames and [Appellant] outside of the house. When asked his name, [Appellant] replied, "my name is mud and I should die for what I did." (N.T. 3-27-2019 AM, pp. 91-97, 110-112). The two boys were subsequently found dead in their upstairs bedroom. The medical examiner concluded that the children died from smoke inhalation and carbon dioxide poisoning and may have been burned while still alive.

[Appellant] was subsequently questioned by the police. [Appellant] told them that after Dippel left, he fell asleep on the sofa, to be awoken by the noise of the fire on the drapes adjacent to the front window. (N.T. 3-28-2019 PM, p. 47).

[Appellant's] testimony at his first trial took on a more fearless tone, even reaching super-heroic proportions as he claimed he tried to enter the house twice but was forced out by the intensity of the heat and flames: tried to put the fire out with a neighbor's house; had a window explode on him and cut him; screamed at people to help him after a cop refused to radio in the house fire; grabbed a cop and drug [sic] him out of his police car and fought him because the cop would not help him; was hit from behind by another cop; and woke up across the street handcuffed to a fence, at which time he tried to rip the fence down, so the police started beating him. (N.T. 3-28-2019 PM, pp. 49-52). [Appellant] claims he finally got himself free of the handcuffs and fence and ran into the house. (N.T. 3-28-2019 PM, pp. 53-54). [Appellant] further testified he got into the house a couple of times. (N.T. 3-28-2019 PM, pp. 53-54). When this failed, [Appellant] claim[ed] he grabbed the hose again, knocked the neighbor's door down running upstairs at his neighbor's house, punching the wall to break through, but the neighbor child started choking, so [Appellant] grabbed the tot and carried him down the steps and outside to safety. (N.T. 3-28-2019 PM, pp. 54-61). [Appellant] then testified that he kicked in his kitchen door, filled a big kitchen pot with water and tried to get through the house

- 4 -

spreading the water from the pot with a towel, when the dining room ceiling came crashing down on him and he couldn't go any further. (N.T. 3-28-2019 PM, pp.53-57). At that point [Appellant] swore he grabbed a ladder attempting to climb it several times, but the force of the flames knocked him off the ladder. (N.T. 3-28-2019 PM, pp. 57-59). He tried again but the ladder fell apart. (N.T. 3-28-2019 PM, pp. 58-59). [Appellant] testified that at that point he started losing it and somehow woke up around the front of the house with five cops on top of him, beating him. (N.T. 3-28-2019 PM, pp. 59-61). They again handcuffed him, this time to the neighbor's railing at which he flipped out, ripped the railing out of the steps and then picked up and threw the cop. (N.T. 3-28-2019 PM, pp. 61-62). [Appellant] testified that he then had another fight with the cops around the corner, bringing the count to three separate fights with the police: the first with two officers after yanking one officer out of his patrol car, the second with five cops, and the third time with an unknown number of policemen. (N.T. 3-28-2019 PM, pp. 60-63). Finally, [Appellant] contends he was put in a patrol car and taken to JFK hospital, where the doctor stated that he needed stitches but [Appellant], ever self-reliant, refused them. After that, [Appellant] claims the police took him out of the hospital, but he doesn't know what happened after that. (N.T. 3-28-2019 PM, pp. 62-65). Despite all of this, there were no burns, smoke, soot or ash on the person of [Appellant].

Capt. Thomas Schneiders is a fire investigator, having previously been a firefighter since 1972 for the City of Philadelphia, promoted to lieutenant and then to investigator for the Fire Marshall's Office for five and a half years before being promoted to Captain. (N.T. 3-29-2019 AM, pp. 10-25). Capt. Schneiders testified to a reasonable degree of scientific certainty that there had been three points of origin at the Carver Street house and that the cause of the fire was arson. This expert further testified to the effects of full room involvement and 'flashover', but concluded to a reasonable degree of scientific certainty that there were three points of origin of the fire, that it was of incendiary origin, and was intentionally set.

Defense expert, Timothy Hattwick, claimed that the Carver Street house fire had "full-room involvement" where everything burns such that it would be impossible to determine the point or points of origin of a fire. Although Hattwick never viewed any of the physical evidence, he did examine then Fire Lieutenant Quinn's pictures of Carver Street as well as the lieutenant's interviews with [Appellant], firefighters and police present during the fire. Hattwick could not determine if the cause of the fire was

accidental or arson merely that the cause would have to have been classified as undetermined. The defense also presented the expert testimony of Craig Beyler to corroborate the expert opinion of Mr. Hattwick.

On April 8, 2019, the jury returned a verdict of guilty of two counts of murder of the second degree and arson. Mr. Dougherty was sentenced to two consecutive life sentences.[3]

Trial Court Opinion, filed 8/12/19, at 1-7.

Appellant filed a timely notice of appeal with this Court on May 7, 2019. The trial court issued its Order pursuant to Pa.R.A.P. 1925(a) the next day, and Appellant filed his statement of matters complained of on appeal on May 29, 2019. The trial court filed its Rule 1925(a) Opinion on August 12, 2019.

In his brief, Appellant presents the following Statement of Questions Involved:

1. Where this Court has previously granted [Appellant] a new trial based on the erroneous admission of recorded testimony from Assistant Fire Marshal John Quinn, did the trial court commit reversible error under the Confrontation Clause by admitting Quinn's report, other work product, and testimony regarding his investigation and conclusions?

2. Where this Court has previously granted [Appellant] a new trial based on the erroneous admission of character evidence and "prior bad acts" testimony, did the trial court commit reversible error by admitting similar evidence for a similar purpose?

3. Where [Appellant's] testimony at his first trial was induced by a constitutional violation, i.e., ineffective assistance of counsel, did the trial court commit reversible error by admitting that testimony?

---

[3] Specifically, Appellant received two consecutive sentences of life in prison without the possibility of parole on the murder convictions and a term of twenty (20) years to forty (40) years in prison on the arson conviction to run consecutively to the life sentences.

4. Where the trial judge's prior comments reflected bias against [Appellant] and created a lack of impartiality or of the appearance of impartiality, did the trial court abuse its discretion by denying [Appellant's] motion for recusal?

Appellant's Brief at 2-3.

Appellant's first three issues challenge the trial court's admission of certain evidence at his third trial. In analyzing such challenges, we are guided by a well-settled standard of review:

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015).

Appellant first asserts the trial court improperly permitted the Commonwealth to admit the testimonial hearsay of Assistant Fire Marshall John Quinn.[4] Appellant posits the testimony of the Commonwealth's testifying expert, Fire Investigator Thomas D. Schneiders, who was not a part of the original investigation, effectively allowed the Commonwealth to present Mr. Quinn's findings and conclusions, although he had never been subjected to a

---

[4] Mr. Quinn was deceased at the time of Appellant's third trial, and health issues had prevented him from testifying at the second trial.

thorough cross-examination,[5] in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution and of this Court's previous holding in our Memorandum Decision filed on October 31, 2017. Brief for Appellant at 21-25 (citing **Commonwealth v. Dougherty**, No. 1648 EDA 2016, unpublished memorandum at 14-15, 21-24 (Pa.Super. filed Oct. 31, 2017).

Initially, we note that although Appellant cites to numerous instances in his appellate brief wherein he alleges testimonial hearsay pertaining to Mr. Quinn's findings and legal conclusions were admitted in violation of his constitutional rights at trial, **see** Brief for Appellant at 18-28, a review of the trial transcript reveals Appellant failed to make a timely and specific objection to their admission at the time of Mr. Schneider's direct examination.

To preserve a claim of error for appellate review, a party must make a specific objection to the alleged error before the trial court in a timely fashion and at the appropriate stage of the proceedings; failure to raise such objection results in waiver of the underlying issue on appeal. **Commonwealth v. May**, 584 Pa. 640, 887 A.2d 750 (2005), *cert. denied*, 549 U.S. 832, 127 S.Ct. 58, 166 L.Ed.2d 54 (2006) (reiterating absence of specific and contemporaneous objection to error waives issue on appeal); **Commonwealth v. Arroyo**, 555

---

[5] While Mr. Quinn testified and was cross-examined at Appellant's first trial, trial counsel's ineffectiveness at that proceeding resulted in a new trial, Appellant's second.

Pa. 125, 723 A.2d 162 (1999) (explaining if ground upon which objection is based is specifically stated, all other reasons for its exclusion are waived). Additionally, "the law is clear that issues, even those of constitutional dimension, are waived if not raised in the trial court. A new and different theory of relief may not be successfully advanced for the first time on appeal." *Commonwealth v. Cline*, 177 A.3d 922, 927 (Pa.Super. 2017), *appeal denied*, 646 Pa. 735, 187 A.3d 210 (2018); Pa.R.A.P. 302(a).

In addition, Pennsylvania Rule of Evidence 103 provides, in relevant part, that a party may claim error in a ruling to admit or exclude evidence only if the ruling admits evidence and the party makes a timely objection and states the specific ground on the record. Pa.R.E. 103(a)(1). It is well-settled that this Court "will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected." *Fillmore v. Hill*, 665 A.2d 514, 516 (Pa.Super. 1995)). "The principle rationale underlying the waiver rule is that when an error is pointed out to the trial court, the court then has an opportunity to correct the error … By specifically objecting to any obvious error, the trial court can quickly and easily correct the problem and prevent the need for a new trial." *Id.* (citations omitted).

In light of the foregoing, we find Appellant's failure to object in a timely and specific manner to the portions of Mr. Schneiders' testimony he now

challenges in his appellate brief has resulted in his waiver of his first issue raised on appeal.

Notwithstanding, even if Appellant had properly preserved this issue for our review, it would afford him no relief.

In its February 26, 2019, Order, the trial court held, in relevant part:

1.   The Commonwealth is precluded from entering into evidence Fire Marshall Quinn's written report or prior testimony, The Commonwealth's expert witness is permitted, pursuant to Pa. R.E. 703 and 705 to state the facts and/or data upon which his opinion is based and the facts and/or data this expert has been made aware of, providing a proper foundation is laid that experts in that particular field would reasonably rely upon those kinds of facts and/or data in forming an opinion on the subject.

This Order in no way transgresses our prior Memorandum Opinion of October 31, 2017, wherein this Court did not preclude the Commonwealth from presenting at a subsequent trial the factual course of the original fire investigation, which both Mr. Schneiders and defense experts utilized in formulating an opinion as to the cause of the blaze.   To the contrary, we observed that:

> At the new trial, [Appellant] with the assistance of experts, cross-examined Schneiders about the basis for his opinion. Schneiders's testimony provided no opportunity to challenge Quinn's investigation, as Schneiders testified as to what he thought Quinn "would have" done during the investigation. [Appellant] could not effectively cross-examine Schneiders regarding the scientific basis for Quinn's opinions.
>
> ***
>
> Viewed in this light, the record does not support the conclusion that [Appellant] had a "full and fair" opportunity to cross-examine Quinn during the first trial.   [Appellant] was

- 10 -

deprived of this opportunity through the violation of his Sixth Amendment right to effective counsel. In addition, Schneiders's testimony did not remove the taint caused by counsel's ineffectiveness. Applying [**Commonwealth v.**]**Bazemore** [614 A.2d 684 (Pa.Super. 1992)] and its progeny, we conclude that the trial court erred in admitting the prior testimony of Quinn at [Appellant's] retrial.

**Commonwealth v. Dougherty**, 1648 EDA 2016 at *16-17 (Pa.Super filed Oct. 21, 2017).

In compliance with this Court's Memorandum Opinion and the trial court's pretrial Order, the Commonwealth presented Mr. Schneiders' opinion regarding the cause of the fire based upon his independent investigation. This analysis necessarily involved a consideration of the photographs and data Mr. Quinn had collected at the scene, as Mr. Schneider was not present during the initial investigation. Appellant's representations to the contrary, Mr. Schneider did not serve as a conduit for Mr. Quinn's testimony but, rather, utilized this extrajudicial evidence to formulate his own, expert opinion, and he was subject to a thorough cross-examination thereon.

Appellant next states the trial court erred in permitting testimonial evidence of Appellant's prior alcohol use and alleged propensity for violence against women. Brief for Appellant at 29-35. In its August 12, 2019, Opinion, the trial court found these allegations to be devoid of merit and in support of its finding reasoned as follows:

[Appellant] specifically protests the following direct examination of Kathleen McGovern:

Q. And so at that point in time, you are 23, 24 years old and you're now living with [Appellant] and his two children and your son, the five of you, correct?
A. Correct.
Q. And [Appellant's] 24, 25 years old, correct?
A. Correct.
Q. And the relationship that you have with [Appellant] starts to become problematic; is that correct?
MS. FARMER Objection.
THE COURT: Overruled.
The Witness: It could be.
BY MR. VOCI:
Q. There's problems in the relationship, correct?
A. There could be.
Q. Well, it's not that there could be; there was, right?
A. Sometimes.
Q. Okay. And the problems were related to his drinking, correct?
A. Most of the time.
Q. And the problems that related to his drinking were the fact that he wasn't pleasant to be around when he was drinking, correct?
MS. FARMER: Objection.
THE COURT: Sustained.
BY MR. VOCI:
Q. That he wasn't responsible when he was drinking?
MS. FARMER: Objection.
THE COURT: Sustained.
BY MR. VOCI:
Q. So his drinking became a problem in your relationship and what did you do as a result of his drinking?
A. I got angry.
Q. Did you ask him to do anything?
A. Yes.
Q. What did you ask him to do?
A. To go to AA.
Q. So is it fair to say to the members of the jury that his drinking was so pervasive and so problematic that you had asked him to go to Alcoholics Anonymous to stop drinking?
MS. FARMER: Objection.
THE COURT: Sustained. Move on.

(N.T. 3-27-2019 PM, pp. 54-56.)

Clearly the court sustained any objection made as to [Appellant's] drinking. The only overruled objection was to whether these people were having problems in their relationship, which obviously is not improper character evidence precluded under Pa.R.Evid. 404(a) or 404(b), or the Superior Court's prior Opinion in this matter.

The next complained of improper character evidence is during the examination of [Appellant's] ex-wife, as follows:

Q. Why didn't you want to go into the house?
A. Because it wasn't my house.
Q. Okay. Is there any other reason you didn't want to in?
A. I didn't know what was going to happen -
MS. FARMER: Objection.
THE WITNESS: -- to me.
THE COURT: Overruled.
BY MR. Voci:
Q. What do you mean by that?
A. Or if he did - if he would do anything to me.
MS. FARMER: Objection.
THE COURT: Overruled.
BY MR. VOCI:
Q. What do you mean?
A. Try to make a pass on me. I know that him and Kathy were arguing - oh, my GOD. And I just didn't want to go in the house, but I don't know. It's so hard.

(N.T. 3-28-2019 AM, pp. 85-86).

This had nothing to do with improper character evidence, but the witness was asked, and stated why she did not want to go into the house on the night of the fire. The inquiry did not ask for, or lead to a witness discussing prior crimes or wrongdoings, but the activities on the night of the arson.

[Appellant] also complains about the following examination of his former spouse:

Q. So you did not want to go upstairs?
A. No.
Q. And why didn't you want to go upstairs?
A. Because I was afraid. I didn't -
MS. FARMER: Objection.

THE COURT: Overruled.
THE WITNESS: I didn't know if the kids were up there or not, and I didn't want to go up there because I was afraid he would make a pass on me. I didn't...
BY MR. VOCI:
Q. Had he done that before?
MS. FARMER: Objection.
THE COURT: Sustained.

(N.T. 3-28-2019, AM pp. 88-89).

Ms. Dippel's further testimony that the reason she did not go upstairs that night was certainly not prior crimes or wrongdoings and as noted above, when the prosecutor asked about any prior incident the objection was immediately sustained.

The final grievance raised concerning Ms. Dippel's testimony is as follows:

Q. And it's now 2:15 in the morning; you are barefoot; he's dragged you out of Norman's house in the middle of the night?
A. Yes.
Q. Interrupted your sleep not once but twice?
A. Yes.
Q. Drags you there barefoot, refuses to give you a ride home?
A. Yes.
Q. After making a pass at you?
A. Yes.
MS. FARMER: Objection.
THE COURT: Overruled.

(N.T. 3-28-2019 AM, p. 109).

Again, this testimony concerns the events that evening, a few hours prior to the arson. No previous wrongdoing was called for in the question or the answer provided by [Appellant's] former spouse.

[Appellant] finds fault with the examination of [Appellant] as follows:

Q. When you first saw Kathy Schuler that night, were you in a bar?

- 14 -

A. Yes, sir.
Q. Right. You were drinking; am I right?
A. Yup.
Q. You were with your friends; am I right?
A. One friend.

(N.T. 3-28-2019 PM, p. 70).

[Appellant] also complains about the testimony from March 28, 2019, pp. 71 to 76. The following is a full transcript of the complained of evidence:

Q. When you first saw Kathy Schuler that night, were you in the
bar?
A. Yes, sir.
Q. Right. You were drinking; am I right?
A. Yup.
Q. You were with your friends; am I right?
12
A. One friend.
Q. Who was he, one friend?
A. Brad.
Q. What's his last name?
A. Edward Bradley.
Q. And you testified, I believe, that before Kathy showed up, you had had about two drinks, two rums and Cokes, right?
A. No. I had two shots.
Q. Two shots of what?
A. I was putting them in with the soda.
Q. You weren't supposed to be having any alcohol that night because you were supposed to attend the AA meetings; is that right?
a. Wrong.
Q. Wrong?
A. Wrong.
Q. You weren't supposed to be at the AA meeting?
A. No, I wasn't.
Q. Let me ask this. Do you recall ever supposed to having attended an AA meeting?
A. Yeah.
Q. You weren't supposed to drink because you had an alcohol problem; is that right?

A. No.
Q. You didn't have an alcohol problem?
A. Nope.
Q. Was it a source of contention, an argument between you and Kathy Schuler, that you had an alcohol problem?
A. So was pot and V's.
Q. Pot and V's?
A. Yes.
Q. Who was taking - who had the pot and V's?
A. She did.
Q. She had a pot and V's problem?
A. Yeah.
Q. You had no problem at all, right? You didn't have an alcohol problem; is that right?
A. Nope.
Q. But she complained about you having an alcohol problem, right?
A. Yup.
Q. She thought you had an alcohol problem, right?
A. Yup.
Q. She nagged you about having an alcohol problem, right?
A. No.
Q. She didn't nag you about having an alcohol problem? Let me ask you this, sir. Did she ask you about having an alcohol problem?
A. Twice since I was with her.
Q. Before the fire, how long had you been with her?
A. About a year and-a-half
Q. You had been with her about a year and-a-half?
A. Yup.
Q. And in a year and-a-half, she had mentioned a time or two that she thought you had an alcohol problem?
A. Yeah. She said I drank too much.
Q. But she never asked you to go to an AA meeting in all that time?
A. No.
Q. So she was not mad that night when you were drinking; is that right?
A. Yeah. She was mad.
Q. She was mad that you were drinking, right?
A. Yeah.
Q. She was mad that you were in the bar, is that right?

A. Probably.

Q. Did she indicate to you that she was mad because you were in the bar?

A. She came in and said, "Get the P home."

Q. Are you telling the jury, sir, that you didn't know that the night she came in that you were supposed to be in an AA meeting? Is that what you're testifying?

A. I wasn't supposed to be at an AA meeting.

Q. That's what you're saying?

A. That's what I'm saying.

Q. Okay. So it really wasn't an ongoing problem between you and Kathy that she thought you had a drinking problem; is that right?

A. Once in a while she said so.

Q. Once in a while?

A. Yeah.

Q. How often is once in a while?

A. Twice.

Q. In a year and-a-half, she mentioned it twice?

A. Yup.

Q. When was the last time before the fire she mentioned she thought you had an alcohol problem?

A. Can't remember.

Q. You can't remember? Give us an estimate. Give us your best guess.

A. I don't know.

Q. What did she say? What were the words she used in describing her perception that she thought you had an alcohol problem?

A. "You drink too much."

Q. "You drink too much." Just like that, a passing casual conversation, just an observation, "You drink too much." Nothing further, right? She wasn't nagging, she wasn't arguing, just a passing comment, right?

A. All women nag.

Q. And that was the end of that?

A. Basically.

Q. So you're at the bar, the Ashburner Bar, right, that night?

A. Yup.

(N.T. 3-28-2019 PM, p. 70-75).

First, it needs to be noted that no objection was made to any of the complained of testimony. Failure of [Appellant] to raise a specific, contemporaneous objection renders his claim waived. Pa.R.E. 103; Pa.R.A.P. 302(a); *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008); *Commonwealth v. May*, 584 Pa. 640, 887 A.2d 750, 758 (2005) *cert. denied*, 549 U.S. 832, 127 S.Ct. 58, 166 L.Ed.2d 54 (2006). Accordingly, any claim as to this testimony is waived.

Addressing the issue on its merits, the admission of evidence is within the sound discretion of the trial court and will not be reversed absent a showing that the trial court clearly abused its discretion. An abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised was manifestly unreasonable. *Commonwealth v. Handfield*, 34 A.3d 187, 207-08 (Pa.Super. 2011). The scope of cross-examination is addressed by Pennsylvania Rule of Evidence 611(b) which states:

"Cross-examination of a witness other than a party in a civil case should be limited to the subject matter of the direct examination and matters affecting credibility, however, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Pa.R.E. 611(b).

Precedent is unmistakable: "Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness' motive for testifying. The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 527 (2005); *Commonwealth v. Ballard*, 622 Pa, 177, 80 A.3d 380 (2013). Any witness may be impeached by showing the witness' partiality or prior inconsistent statements, in accordance with Pa.R.E. 607 and Pa.R.E. 608.

As part of [Appellant's] pre-trial Omnibus Motions, [Appellant] requested that the prosecution be barred from introducing at trial any evidence of prior bad acts, which the Superior Court expressly found was introduced into evidence in [Appellant's] prior trial in error. ([Appellant's] Pre-Trial Memorandum, p. 14). What the Superior Court found was that the [Appellant's] prior physical abuse of his ex-wife as well as his then girlfriend, especially when confronted about his alcohol consumption, was inadmissible and improperly admitted in the second trial. (*Commonwealth v. Dougherty*, 1648 EDA 2016, pp.

- 18 -

25-30). A review of the complained of testimony clearly shows that [Appellant's] prior physical attacks upon either of these witnesses was [sic] not presented at [Appellant's] latest trial. As such, [Appellant's] allegations of error are without merit and need be denied.

*See* Opinion filed 8/12/19, at 9-16.

Upon our review, we find no error in the trial court's sound analysis. The trial court correctly found Appellant waived any challenge to his cross-examination for his failure to object in a timely and specific manner at trial. *See*, *supra*. Notwithstanding, as the aforementioned illustrates, Ms. McGovern's testimony did not introduce evidence of a crime or bad act. Rather, it revealed simply that Appellant's drinking caused problems in the couple's relationship, not that he became violent towards Ms. McGovern due to his drinking. In addition, Ms. Dippel's testimony concerning her decision not to accompany Appellant upstairs for her subjective fear he would make a "pass" at her explained her actions that evening and did not constitute the introduction of improper evidence that was unduly prejudicial to him at trial.

Also, to the extent Appellant challenges portions of the prosecution's closing argument which he deems impugn Appellant's character, *see* Appellant's Brief at 32-33, we note that Appellant did not raise a timely and specific objection to those statements at the time of at trial. Therefore, this argument is waived. *See supra*.

Appellant further submits the trial court abused its discretion by admitting testimony from his first trial at his third trial because the former

was the fruit of the poisonous tree. Appellant posits his prior testimony should have been excluded as it was tainted by the ineffective assistance of his trial counsel who failed to produce an expert witness to contradict Fire Marshall Quinn. Brief for Appellant at 35-38. Appellant reasons that because the prosecution referenced Mr. Quinn's testimony in its cross-examination Appellant, all of his prior testimony should be precluded, and he relies upon **Harrison v. United States**, 392 U.S. 219, 222 (1968) for this proposition.

The defendant in **Harrison** objected to the admission of earlier confessions as illegally obtained, and he testified at trial to present his own version of events. While he did not admit guilt, he placed himself at the scene of the crime. On appeal, the introduction of the confession was found to be error and the case was remanded. **Id.** at 221. Upon remand and retrial, the original confession was excluded, and the defendant did not take the stand. Notwithstanding, the prosecution admitted the defendant's testimony from the first trial. **Id.** In its narrow holding, the United States Supreme Court held that the prior testimony was inadmissible as fruit of the originally illegally obtained confessions. **Id.** at 226.

Appellant's arguments to the contrary, the case before us is distinguishable from **Harrison**, which limited its decision to "only a case in which the prosecution illegally introduced the defendant's confession in evidence against him at trial in its case-in-chief." **Id**. at 223 n.9. Herein, there was no police misconduct, and Appellant did not confess to the crimes.

Nor was there any inadmissible or even challenged evidence impelling Appellant to testify in his first or his third trial, but for Appellant's alleged compulsion to testify to refute Fire Marshall Quinn's testimony at the first trial which was not subject to a full and fair cross-examination. However, Appellant fails to acknowledge that his initial testimony was consistent with his statement to police, the admission of which he does not challenge, that he attempted to reenter the burning home to save the children. *See* N.T., 3/29/19, at 114-129.

Lastly, Appellant contends the trial court erred in denying his pretrial motion for recusal. Appellant cites to statements the trial court made prior to imposing sentence following his second trial as proof that it should have recused itself prior to presiding over his third. *See* Brief for Appellant at 38-40.

In analyzing this issue, we are guided by a well-settled standard of review:

> This Court reviews the denial of a motion to recuse for an abuse of discretion. An abuse of discretion is not merely an error of judgment, but occurs only where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record.
> A party seeking recusal must assert specific grounds in support of the recusal motion before the trial judge has issued a ruling on the substantive matter before him or her. Recusal is required wherever there is substantial doubt as to the jurist's ability to preside impartially. Further, because the integrity of the judiciary is compromised by the appearance of impropriety, a jurist's recusal is necessary where [the judge's] behavior appears to be biased or prejudicial.

*Bowman v. Rand Spear & Associates, P.C.*, 234 A.3d 848, 862 (Pa.Super. 2020) (citations and quotation marks omitted).

In support of its decision not to recuse itself, the trial court stated the following:

> [Appellant] had twice previously been convicted on this case. The trial court in this third trial was the same jurist who presided over this [Appellant's] second trial. Following the juries' guilty verdict in the second trial, this court sentenced [Appellant] to life without parole. During the sentencing, the court stated its reasons for making the sentences consecutive, stating: "For the record, I haven't seen such a despicable crime in a long, long time. To kill your own children just to get back at these two woman [sic] was just - there aren't words for it. There are just no words for it." It is this statement for which [Appellant] contends the court improperly denied the recusal request for his third trial. This statement was made after a jury, not the court, found [Appellant] guilty of setting three fires to burn down the house in which his children were sleeping. The jury was the finder of fact, not the court. It was the jury that found that [Appellant] had set the three fires that killed his two children. The court was imposing sentence on the facts found by the jury and an explanation was required as to why the sentences were being imposed consecutively rather than concurrently. In addition, the upcoming third trial was already called as a jury trial, and again the court would not be the finder of fact.
>
> The appellate court presumes that the judges of our Commonwealth are honorable, fair and competent. *Commonwealth v. Druce*, 577 Pa. 581, 848 A.2d 104, 108 (2004) (citing *Commonwealth v White*, 557 Pa. 408, 734 A.2d 374, 304 (1999)). Furthermore, the decision regarding recusal are [sic] made first, by the trial judge as a matter of self-analysis to determine whether they [sic] can be fair and impartial. "This assessment is a 'personal and unreviewable decision that only the jurist can make.' *Commonwealth v. Druce*, 577 Pa. 581, 848 A.2d 104, 108 (2004) (quoting *Commonwealth v. Tharp*, 574 Pa. 202, 830, A.2d 519, 534 (2003)). Next the court needs to determine whether their [sic] continued presence on the case "creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary." *Id*. This court conducted such a self-

- 22 -

assessment determining that he could fairly and impartially preside over this case and further that his continued presence would not create an appearance of impropriety. The jury determined that [Appellant] was guilty of two counts of second degree murder in the second trial, and a new jury would determine the facts in the third trial.

Trial Court Opinion, filed 8/12/19, at 20-22.

Appellant baldly contends the trial court's "willingness to ascribe murderous intent to [Appellant] despite the jury's finding to the contrary, is sufficient to give the impression to both [Appellant] and the public that the trial court believed [Appellant] had formed a criminal intent that the jury had determined he had not." Brief for Appellant at 40. However, in the three pages he devotes to this issue in his appellate brief, Appellant points to no record evidence that the trial court's impression following the second trial in any way prejudiced Appellant in the subsequent proceeding. To the contrary, as the trial court points out, the jury, as the finder of fact herein, found Appellant to be guilty of two counts of murder and a single arson count on the evidence presented in the third trial. Thus, the trial court's statements prior to sentencing Appellant in his second trial bore no relevance to the jury's decision herein.

In light of all of the foregoing, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/23/20</u>